405 MONROE COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. CITY OF ASBURY PARK, A MUNICIPAL CORPORATION, DEFEND-ANT-RESPONDENT.

Argued April 2, 1963—Decided July 1, 1963.

458

*Mr. Isadore Glauberman* argued the cause for appellant (*Mr. Sheldon A. Weiss,* on the brief; *Messrs. Stout and O'Hagan,* attorneys).

*Mr. Robert V. Carton* argued the cause for respondent (*Mr. James D. Carton, III,* on the brief; *Mr. Ascenzio R. Albarelli,* attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. This action arose out of an agreement whereby plaintiff leased its property to defendant municipality for a term of 25 years, to commence upon the completion of extensive alterations which plaintiff undertook to make. Plaintiff sought specific performance or alternatively damages for breach. Because of the death of the trial judge, the matter was assigned to another judge for decision upon the stenographic record. He found for defendant upon the ground that certain statutory requisites had not been met. *70 N. J. Super.* 293 (*Ch. Div.* 1961). We certified plaintiff's appeal before the Appellate Division heard it.

The property consisted of a ramp garage containing a number of levels. The structure was erected in the mid-1920's. In 1951 it was acquired by Messrs. Cronheim and Vinik, who, finding their purchase an unhappy one, approached the city in the hope that it would be interested in the property. The city had some unsatisfied needs, to wit, a jail, facilities for the municipal court, police headquarters, and additional public parking space. The proposal was that the structure be altered and renovated to supply such facilities. The negotiations began in 1954 and the lease itself was executed on December 31, 1956 by the city and the plaintiff corporation formed by Cronheim and Vinik.

There is no claim of corruption. We think it perfectly clear that the transaction was handled in good faith and in plain daylight. The proposal was debated fully. Other buildings were suggested and considered before the decision was made to accept plaintiff's property. The transaction was

opposed by one councilman, but solely because he thought the deal was a poor one. We are satisfied that none of the legal objections urged in this litigation were advanced during the long period in which the transaction was negotiated and the alterations made. The sole point along legal lines made by the councilman (he is a member of the bar) was that the agreement had to be authorized by an ordinance rather than by a resolution. That claim was met. An ordinance, in which the agreement was set forth at length, was introduced on February 14, 1956 and finally adopted on June 26, 1956. The lease itself was executed at the end of that year, as we have already noted.

The plans and specifications represented the combined effort of both parties. Each selected an architect and the two chose a third. The city's representative watched the work and reported periodically to the City Manager. The city requested certain changes and they were made. According to plaintiff, its actual cash outlay under the agreement was $196,061.56, which, with taxes, interest, and supervision, resulted in a total cost of $264,546.92. On March 25, 1958 plaintiff tendered the structure as completed in accordance with the contract. In the meantime, however, there was a significant change in the local scene. The councilman who had voted against the transaction had led a slate to victory in the municipal election. We think it clear the new administration was minded to get out of the deal if an escape could be found. This became evident in the city's reluctance to specify the work it claimed to be defective or not in accordance with the plans and specifications when it refused plaintiff's tender of the property.

The answer, filed on May 23, 1958, asserted only that plaintiff had failed to perform the contract. The amended answer filed on December 3, 1958 introduced some generalized claims of illegality: (1) the agreement violates *Art*. 8, § 3, *par*. 2 and 3 of the *Constitution* (section 2 prohibits gifts of municipal property or loans of its money or credit; section 3 prohibits donations of municipal property) ; (2) the agreement

"is tantamount to a lease purchase agreement and violates the constitutional provision prohibiting the lending of credit by a municipality"; (3) the agreement is "a legal subterfuge" in that it is "an installment contract of purchase, and, therefore, would result in an increase in the debt limitation of the said City of Asbury Park," contrary to *Art.* 8, § 2, *par.* 3 of the *Constitution* (this provision applies to the State only) ; and (4) the agreement violates *R. S.* 40:47–13 (authorizing a lease for not more than five years for use of the police department). Next we come to the pretrial order dated April 30, 1959, where, seemingly for the first time, the city asserted that the agreement was void because made "without the sanction and approval of the Municipal Finance Commission, as required by *N. J. S. A.* 52:27–22." This was one of two grounds upon which the trial court held for defendant, the other being the absence of an appropriation found to be required by *R. S.* 40:2–29 and 40:50–6, which further ground itself seems different from the issues projected in the amended answer and pretrial order. And at some stage after pretrial defendant advanced the additional defense that the transaction fell within the provisions of the public bidding statutes, *N. J. S. A.* 40:50–1 and 40:9–3.

Thus a case which at first involved only the question of performance became progressively more complicated as the city strove to avoid an obligation it had solemnly incurred. The trial court said that it would have found a private corporation was estopped to assert its own internal omissions, but deemed a public corporation to be another matter. Indeed it is, but not without some limitations. The law has become increasingly sensitive to the need for business integrity in public transactions as well as in private ones. True it is important to protect the public against official imprudence, but there is also the moral principle that a government which would encourage fair dealing in private transactions should insist upon nothing less of its own agencies. It is one thing to expect officials to know and stay within their power and to call them to account if they wilfully exceed it. It is some-

thing else to ask all who deal with a municipality to bear the burden of officialdom's ignorance of its own authority.

We have heretofore noted "the strong recent trend towards the application of equitable principles of estoppel against public bodies where the interests of justice, morality and common fairness clearly dictate that course." *Gruber v. Mayor and Township Committee of Raritan Tp.,* 39 *N. J.* 1, 13 (1962). In broad terms, it may be said that where a contract is beyond the power of the municipality or where the Legislature has explicitly barred any liability if a restriction upon the exercise of power is not met, relief ordinarily will be denied. *Slurzberg v. Bayonne,* 29 *N. J.* 106, 115 (1959); *Bauer v. Newark,* 7 *N. J.* 426, 434–435 (1951). But if the difficulty is an irregularity in the exercise of a power the municipality does have and the Legislature had not decreed the consequences of the irregularity, our cases seek a just result. In such circumstances, one who deals with the municipality in good faith may be permitted to invoke the concept of ratification, *Johnson v. Hospital Service Plan of New Jersey,* 25 *N. J.* 134 (1957), or estoppel, *Gruber v. Mayor and Township Committee of Raritan Tp., supra,* 39 *N. J.* 1; *Robbins v. Jersey City,* 23 *N. J.* 229 (1957); *Summer Cottagers' Ass'n of Cape May v. Cape May,* 19 *N. J.* 493 (1955); *Vogt v. Belmar,* 14 *N. J.* 195 (1954); or if in the public interest the agreement itself ought not to be enforced, still relief may be granted to the extent of the benefit conferred upon and knowingly accepted by the municipality, *Hudson City Contracting Co., Inc. v. Jersey City Incinerator Authority,* 17 *N. J.* 297 (1955).

In the present case plaintiff seeks relief in *quantum meruit* if it should be held the contract is unenforceable. That alternative relief, however, is not available since the alterations were to plaintiff's own property and hence no benefit was conferred upon defendant by the work done. Unless the contract is held to be binding, plaintiff is without remedy. We proceed then to the sundry legal objections which are the ramparts of the city, mindful however that as

to those objections the equities are with the plaintiff. In good faith it invested a substantial sum under plans and specifications framed to meet the needs of the city, and if plaintiff performed the agreement but is nonetheless denied relief, it will have for its investment a courtroom, a jail, police headquarters and a pistol range, items of no merchantable value except to a governmental consumer.

## I.

The city contends the transaction was an installment sale rather than a lease, and refers to litigation in our State and elsewhere in which lease arrangements were assailed as evasions of statutory or constitutional limitations, citing *De Lorenzo v. Hackensack*, 9 *N. J.* 379 (1952); *McCutcheon v. State Building Authority*, 13 *N. J.* 46 (1953); Annotation, 71 *A. L. R.* 1318 (1931); Magnusson, "Lease-Financing by Municipal Corporations as a Way around Debt Limitations," 25 *Geo. Washington L. Rev.* 377 (1957); Morris, "Evading Debt Limitations with Public Building Authorities: The Costly Subversion of State Constitutions," 68 *Yale L. J.* 234 (1958).

In the present case no constitutional limitation is involved. The constitutional provisions mentioned above in our recital of defendant's pleadings are not at all pertinent. The question is whether some statutory restraint is evaded, a question which ultimately can be answered only in the light of specific statutes alleged to be offended. We will later point out that the agreement does not clash with the policy of the statutes to which defendant refers. Our immediate purpose is to demonstrate that the parties could and did deem the agreement to be a lease and should be barred from disputing its nature at this late date.

The agreement calls for the payment of net rental, the lessee municipality to assume all burdens including taxes, insurance and repairs. It provides for continued liability even if the building is destroyed, with insurance proceeds made

available for rebuilding. All of those provisions are consistent with conventional long-term leases.

There is, however, a singular provision upon which the city places great stress. Under it the city will receive title upon paying $1 at the end of the 25-year term. The trial court held the city had to accept title and had no choice in the matter. We think it is not crucial whether that is so, and for convenience we refer to this provision as creating an option. The city argues that the option price of a dollar demonstrates that the periodic payments represent the purchase price, and hence the transaction must be a sale. Ordinarily that would be so, but not under the peculiar facts of this transaction.

Since a lessor expects to recover out of rent the depreciation in his investment in addition to a return upon that investment, the amount of rent necessarily depends upon the life expectancy of the structure. If the term of a lease equals the expected life of a building, the lessor will seek to recapture its full value within that period. In such circumstances an option to buy the residual value at the end of the term for a small sum is compatible with the concept of a lease.

Here we have a structure which as a ramp garage was quite single in its purpose and with the alterations we have described became uniquely so, since a jail, a courtroom, police headquarters, and pistol range are of no general utility. Hence the lessor would expect to recoup his investment during the period of the lease. A realtor testified that after 25 years the structure would be of no value to the owner and the cost of demolition would equal the land value. That testimony is somewhat supported by the objecting councilman himself, who in opposing the transaction argued that at the end of the term the city would have on its hands a decrepit building which then would be some 55 years old.

In these circumstances the parties could understandably have intended the stipulated periodic payments to constitute rent and nothing else. On the one hand, the lessor,

doubtful of any residual value to it of a building altered for those municipal purposes, would insist upon recapturing the investment within the term of the lease, while the lessee, accepting and yielding to the lessor's thesis for fixing rental value, would then expect a terminal option to buy for a nominal sum in the hope that the structure will still be fit to serve the city's special needs. In terms of fiscal integrity, the essence of a lease transaction is that the annual rent shall represent what the parties believe to be the annual value of the use and enjoyment. Two realtors testified the agreed rent represented a fair rent and no expert testified to the contrary. The parties could believe their arrangement was one of lease.

It is of no moment that all knew the city was not financially able to build its own facilities, for it is equally true that the city had the power to meet its needs by lease rather than by purchase. *R. S.* 40:60–1, 6. The trial court found there was good faith, but nonetheless held the transaction was an installment sale, essentially because of the option to buy for a dollar. We think that fact is compatible with a lease, and that being so, we think the plain demands of morality, to which we referred earlier, bar the city from asserting that it resorted to the form of a lease to conceal some ugly purpose. In any event, we are satisfied that in fact the parties did honestly intend the transaction to be precisely what it purports to be.

## II.

The trial court found there was a violation of the Municipal Finance Commission Act, *N. J. S. A.* 52:27–1, *et seq.*

On March 7, 1935 the city was placed under the control of the Municipal Finance Commission pursuant to the statute just cited. That statute was enacted in 1931 (*c.* 340) to deal with municipalities which defaulted in their obligations. It provided for what has been described as essentially an equity receivership, to continue until provision is made for

the payment of arrearages and of bonds and notes which will fall due within the ensuing year. *N. J. S. A.* 52:27–4. See *Schierstead v. Brigantine,* 29 *N. J.* 220 (1959), for a discussion of this act. A satisfactory plan having been evolved, a justice of the former Supreme Court on December 10, 1938 ordered that the Municipal Finance Commission cease to function in the City of Asbury Park. See *Asbury Park v. Smock,* 121 *N. J. L.* 487, 488 (*Sup. Ct.* 1939); *Roberts v. Hetrick,* 125 *N. J. L.* 633, 634 (*E. & A.* 1941). Thereupon there came into play the last paragraph of *N. J. S. A.* 52:27–4, which now reads:

"Thereafter the Director of the Division of Local Government in the State Department of Taxation and Finance shall have the power to continue the employment of the auditor as provided for in section 52:27–6 of this Title, and to exercise the powers of the commission under section 52:27–22 of this Title, until the gross and net debt of such municipality, including notes or bonds issued under this chapter, is within all statutory limits, at which time his authority under this chapter shall cease."

It will be noted that the provision just quoted confers "power" upon the Director, leaving to his judgment whether it need be exercised. It is clear that the Director continued the employment of an auditor. The question is whether he also invoked the powers theretofore in the Municipal Finance Commission under *R. S.* 52:27–22, the pertinent part of which reads:

"In order to conserve the financial resources of the municipality, its governing body, without the assent in writing of the commission, shall pass no ordinances or resolutions authorizing the issuance of notes or bonds of any kind or character or creating any obligation or indebtedness of the municipality, except tax anticipation or tax revenue notes or bonds for the current year. Nor shall such governing body, without like consent, include in any annual budget or tax ordinance amounts for local expenditures in excess of the like amounts for the preceding annual budget, exclusive of appropriations for the purpose of raising the principal and interest on the public debt."

To sustain its affirmative defense of illegality under the statute just quoted the city had to prove (1) that the Direc-

tor had required the city to obtain his assent and (2) that such approval was not in fact obtained with respect to the agreement here in question. We note that the issue does not turn upon whether the arrangement is that of a lease or of some other nature, for in any view of it, the contract came within *R. S.* 52:27–22 if the Director exercised his power under that statute.

The city did not prove either of the facts necessary for its defense. It called the city clerk, who testified that in or about 1934 the city "went under the Municipal Finance Commission, and subsequent to that it is now called the Local Government Board and we are under supervision of the Local Government Board." Then followed:

"Q. To what extent does the Local Government Board supervise or control the fiscal affairs or financial affairs of the City of Asbury Park?
Mr. O'HAGAN: I object to this, your Honor please. The statute on this, it is part of the general law.
THE COURT: Yes. I would take judicial notice of the fact—
Mr. CARTON: If your Honor does, that's all right. That is adequate, as far as I am concerned."

The foregoing cannot support a finding that the Director (1) had invoked the statute or (2) did not in fact approve this transaction. On the record the defense must fail.

Obviously the Director or the auditor he employed would be an appropriate source of factual information. We were not sure whether the colloquy quoted above somehow misled counsel for the city to omit proof he then had on hand. In the circumstances we suggested at the argument that counsel confer with the Director and stipulate the facts. That course should not have been difficult. Counsel, however, were unable to agree upon what the Director would say and each side filed a unilateral statement of its effort in that regard.

We of course could not use the added material as the basis for a finding on the factual issue, but we did examine the supplemental statements to see if there was an affirmative indication of proof which the city might offer and should be

permitted to offer. We found none. We think it incredible that the governing body did not obtain the Director's approval if it were needed. The statute declares a violation to be a misdemeanor. *N. J. S. A.* 52:27-22.2. At least two councilmen were members of the bar. The city attorney passed upon the legality of the transaction. The transaction was much publicized. The auditor named by the Director had to know of it. The 1957 budget, which contained an appropriation for rent for that year under this lease, was approved by the Director. In the circumstances, including the basic equities we discussed earlier in this opinion, we think we should not prolong the litigation of this claim of illegality. We resolve it in favor of plaintiff.

## III.

As we have said, the lease was authorized by ordinance adopted in 1956 and was executed on December 31 of that year. The budget for 1956 contained no appropriation for any obligation under the lease, and understandably so since the city's rental obligation was not to arise until the alterations had been completed and that event could not have occurred in 1956. The budget for 1957 contained an item of $13,500 which was less than the annual net rental of $17,500, but presumably was based upon an estimate as to the likely date of completion. Possession in fact was not tendered the city until 1958.

The city now contends that the contract was void because the amount of the city's liability thereunder was not included in the budget for 1956. It contends for this result under *N. J. S. A.* 40:50-6 and *R. S.* 40:2-29.

*N. J. S. A.* 40:50-6 is the earlier of these statutes. It is one of a number of provisions of the Home Rule Act of 1918 dealing with the formation of contracts. As adopted (an amendment in 1941 is here irrelevant), the statute read:

"No municipality shall enter into any contract, the cost of which is to be met by funds not included in the budget of appropriations for the year, unless prior thereto there shall have been regularly

adopted by the governing body an ordinance authorizing an appropriation sufficient to meet the cost of carrying out the provisions of the contract. This section shall not apply to the use of funds of departments, such as water departments, for the operation of which budget appropriations are not made."

The other statute, *R. S.* 40:2–29, is part of the budget law enacted in 1936. The annual budget is a statement of contemplated expenditures for the budget year together with the moneys expected to be available therefor. The basic idea is that the municipality shall make ends meet within each fiscal year and hence expenditures during a fiscal year should not depart from the budget for that year. *R. S.* 40:2–29 so provides but it seemingly goes beyond that objective and deals also with the area covered by *N. J. S. A.* 40:50–6, to wit, the creation of contractual liabilities. *R. S.* 40:2–29 (since superseded by *N. J. S.* 40A:4–57) reads:

"Except as may be otherwise provided in section 40:2–31 of this Title [this section is not here involved], no officer, board, body or commission shall, during any fiscal year, expend any money (except to pay notes, bonds, or interest thereon), incur any liability, or enter into any contract which by its terms involves the expenditure of money:

a. For any purpose for which no appropriation is provided in the budget or by temporary appropriation pursuant to section 40:2–12 of this Title, or

b. In excess of the amount appropriated for any such purpose.

Any contract, oral or written, made in violation hereof shall be null and void as to the county or municipality, and no moneys shall be paid thereon. Nothing in this section contained, however, shall prevent the making of contracts or the spending of money for capital projects to be financed in whole or in part by the issuance of notes, or bonds, nor the making of contracts of lease or for services or for fuel to be used for heating purposes for a period exceeding the fiscal year in which such contract is made, when otherwise provided by law; provided further, that nothing in this section nor in section 40:50–6 of this Title shall prevent a municipality from making a contract for the spending of money for the purchase of the right, title and interest in the right-of-way of any street railway company in the municipality, when said right-of-way extends in, over and along any public street or highway in the State of New Jersey and the improving or paving of said right-of-way after the same has been acquired."

*R. S.* 40 :2–29 expressly excludes a contract of lease extending beyond the fiscal year in which it is made. The agreement here questioned is a lease, as we have already said, and we see no reason why it should not be treated as a lease within the policy of this statute. Each annual payment should be met out of the budget for the year in which it is payable, and this in harmony with the underlying theme of the budget act.

Our cases assume the two statutes are to be read together. The only question we find is whether it matters that there was no appropriation at all during the year in which the lease was executed, or perhaps to put it another way, whether if there is no appropriation in the budget for that year, *N. J. S. A.* 40 :50–6 requires some other act of appropriation. That question is raised by *Samuel v. South Plainfield,* 136 *N. J. L.* 187 (*E. & A.* 1947).

*Samuel* involved a contract for services extending over a period of years, a contract which seems to be within the exclusion of *R. S.* 40 :2–29. The budget for the year in which the contract was made contained no appropriation, and no payment was to be made during that year.

The cases prior to *Samuel* had held, and the cases since also hold, that a budget appropriation of the amount to be expended in the year the contract is made suffices to satisfy both statutes notwithstanding the contract calls for further payments in subsequent years. See *Viracola v. Commissioners of City of Long Branch,* 142 *A.* 252, 1 *N. J. Misc.* 200 (*Sup. Ct.* 1923) ; *McMahon v. Bayonne,* 163 *A.* 28, 10 *N. J. Misc.* 1215 (*Sup. Ct.* 1932) ; *DeBow v. Lakewood,* 131 *N. J. L.* 291 (*Sup. Ct.* 1944) ; *Murphy v. West New York,* 132 *N. J. L.* 595 (*Sup. Ct.* 1945) ; *Fereday & Meyer Co., Inc. v. Elizabeth Board of Public Works,* 27 *N. J.* 218, 225 (1958) ; *Greggio v. Orange,* 69 *N. J. Super.* 453 (*Law Div.* 1961), affirmed o. b., *sub nom. Roselle v. East Orange,* 37 *N. J.* 462 (1962). Those cases conceive the statutes to guard against expenditure in violation of the concept of annual budgeting and hence that so long as any payment to be made in the year of contracting is covered by an appropriation, the statutes have been satisfied.

*Samuel,* however, took another view of the statutes. It deemed a primary purpose to be to assure public notice and attention to deter "hasty or ill-considered action" in the making of contracts (136 *N. J. L.,* at *p.* 190), and that the objective is achieved by a budget appropriation because of the publicity and hearing upon the budget. On that basis *Samuel* distinguished the line of cases to which we just referred in which an appropriation covering the first year of a contract sufficed. *Samuel* went on to say that if the budget did not contain any appropriation, then there must be "an ordinance authorizing an appropriation" under the terms of *N. J. S. A.* 40:50–6.

In *Samuel* the contract was authorized by *resolution.* The opinion in that case might at one point be read to mean that if the contract had been authorized by *ordinance, N. J. S. A.* 40:50–6 would be satisfied because of the notice and hearing which attend the adoption of an ordinance. If *Samuel* so intended, then the contract before us would meet its view of the statutes since the lease was authorized by ordinance. But the statute requires an ordinance authorizing an "appropriation" and not an ordinance authorizing the "contract," and we do not believe the two can be equated. Hence we think it is not significant that in *Samuel* the contract was made by resolution while here it was made by ordinance.

Accordingly we must meet the question whether an appropriation must be made in the fiscal year of contracting even though no sum will be payable in that year. We see no difference in this regard between the two statutes. It seems to us the alternatives are these: (1) that there must be a present appropriation for the entire contract sum; (2) that no contract can be made unless a sum is payable thereunder in the fiscal year in which it is made; or (3) that no present appropriation is required.

The first alternative would clash with the basic theme of an annual budget, to wit, that there be appropriated only such moneys as will be expended during the fiscal year. Further, from the standpoint of budgeting, it seems odd to say that if a

contract calls for some payment during the fiscal year, the budget need include only that sum, as held by the cases cited above, but that if no payment at all is to be made in the fiscal year, a present appropriation must be made to cover the entire cost of the future benefit or services.

The second alternative is that the Legislature intended to bar the making of a contract unless some payment is required in the year the contract is entered into. That view would be too confining, for it would deny government the necessary authority to provide for present needs whenever in the nature of things no part of the contract price will become due within the year. If a restraint of that character were intended, we would expect to find it stated in direct terms. We must assume the Legislature intended to permit a businesslike approach to the problems of a municipality.

For these reasons we accept the third alternative, that neither statute covers the situation in which no expenditure is to be made in the fiscal year in which the contract is made. In other words, the purpose of the statutes is to protect against expenditures not authorized by the annual budget rather than to provide a plan whereby obligations can be incurred only by ordinance.

This is the view reached in *In re Petition of Gardiner,* 67 *N. J. Super.* 435 (*App. Div.* 1961). The Appellate Division declined to follow *Samuel,* concluding that it was inconsistent with the rationale in *Fereday & Meyer Co., Inc. v. Elizabeth Board of Public Works, supra,* 27 *N. J.* 218. There we held that a three-year scavenger contract made on January 2 and after a temporary appropriation had been made on January 1 under *R. S.* 40:2–12, satisfied these statutes, pointing out in part that a contrary view would "disregard the practical necessities of municipal governmental operations" (27 *N. J.,* at *p.* 226). See also *Home Owners Construction Co. v. Glen Rock,* 34 *N. J.* 305, 315–316 (1961). Although what we said in *Fereday* did not have quite the thrust the Appellate Division found in it, nonetheless *Gardiner* did correctly anticipate our view.

This makes it unnecessary to consider whether the inclusion in the 1957 budget of an appropriation for the rent which was expected to be payable in that year would have ratified the contract if there had been a failure to comply with the statutes. See *City Affairs Committee of Jersey City v. Board of Com'rs of Jersey City*, 134 *N. J. L.* 180, 183 (*E. & A.* 1946) ; but *cf. Bauer v. Newark, supra* (7 *N. J.*, at *p.* 435), and *Slurzberg v. Bayonne, supra* (29 *N. J.*, at *p.* 115).

## IV.

■ Of the remaining issues tendered by the city, we think only one need be discussed. It is the claimed violation of *R. S.* 40:47–13, which reads:

"The governing body may lease for a term of not more than five years, any building, or part thereof, for the use of the police department; and may renew any such lease within a year prior to its expiration, for a similar term."

The question is whether this statute was intended to apply where property is leased for a number of municipal needs including that of the police department. The lease itself does not limit the use to which the premises may be put, but it is undeniable that the premises were intended in part for the use of the police department. The area allotted to that end is physically a small portion of the whole. We do not know how much of the cost of alterations is allocable to that portion.

We incline to the view that the statute applies only to leases for the sole use of a police department and was not intended to prevent a municipality from meeting multiple needs by a lease for a greater term, merely because the police department is also thereby served. In any event, this is the kind of an issue which a municipality should be estopped to urge after it has led another to spend substantial sums upon the strength of an agreement solemnly and openly made.

## V.

The remaining issue is whether plaintiff complied with the plans and specifications. The trial court made no findings and the matter was not developed in the briefs. It is regrettable that so much time has elapsed, for the party which loses this litigation will likely suffer a severe loss. Yet we cannot fairly conclude this case on the record before us. The matter must accordingly be remanded to the trial court for determination of the remaining issue. The trial court may well feel that it needs the benefit of a view of the witnesses and specifics as to the dollar amounts involved in some of the disputed defaults. If the issue is to be retried or the proofs supplemented, the testimony should be taken at an early date.

The judgment is reversed with costs to appellant, and the matter is remanded for disposition of the remaining issue.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.