677 A.2d 747

WANAQUE BOROUGH SEWERAGE AUTHORITY, PLAINTIFF, v. TOWNSHIP OF WEST MILFORD, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT, AND BOROUGH OF RINGWOOD, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, BOROUGH OF WANAQUE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY AND RINGWOOD BOROUGH SEWERAGE AUTHORITY, DEFENDANTS, AND WANAQUE VALLEY REGIONAL SEWERAGE AUTHORITY, DEFENDANT AND THIRD–PARTY PLAINTIFF–RESPONDENT, v. WEST MILFORD MUNICIPAL UTILITIES AUTHORITY; EUGENE RICHARDS, WEST MILFORD TOWNSHIP CONSTRUCTION OFFI-

CIAL; JOHN B. GREENE, WEST MILFORD TOWNSHIP CHIEF SANITARIAN; JACOB MAAS, BOROUGH OF RINGWOOD CONSTRUCTION CODE OFFICIAL; GENE OSIAS, BOROUGH OF RINGWOOD HEALTH OFFICER; AND STATE OF NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, THIRD–PARTY DEFENDANTS.

Argued January 30, 1996—Decided June 26, 1996.

566

*Martin F. Murphy* argued the cause for appellant (*Johnson, Murphy, Hubner, McKeon, Wubbenhorst & Appelt,* attorneys; *Mr. Murphy* and *Robert H. Oostdyk, Jr.,* on the brief).

*Richard S. Miller* for respondent (*Williams, Caliri, Miller & Otley,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the liability of a founding municipality for the debts of a regional sewerage authority. The debts were incurred as planning expenses prior to the provision by the regional authority of waste water treatment facilities to serve the needs of the citizens of the constituent municipalities. Over the twenty-year period between the formation of the concept of a regional authority and the commencement of this lawsuit in 1986, certain of those municipalities had withdrawn from the regional plan. This dispute concerns the liability of the Township of West Milford for a proportionate share of certain expenses incurred during the planning stages before West Milford withdrew from the regional scheme. The specific question is whether, in the absence of a statutorily required service agreement, West Milford may be held liable for that share, especially considering that another independent agency, the West Milford Municipal Utilities Authority (WMMUA), had the franchise to provide sewer service to the citizens of that municipality. We agree with the Appellate Division that in the circumstances of this case liability may be imposed upon West Milford, but limit recovery to the extent that West Milford citizens would be unjustly benefitted if they did not pay the proportionate share.

## I

For purposes of this appeal we accept generally the facts set forth in West Milford's petition for certification. In 1966, the Boroughs of Wanaque, Ringwood, Pompton Lakes and the Town-

ship of West Milford joined to form the Wanaque Valley Regional Sewerage Authority Study Committee (Study Committee) to analyze the feasibility of collecting the treated sewerage in the Wanaque watershed basin. The Wanaque watershed basin is in the northwest parts of Bergen and Passaic Counties and was at that time largely rural. A substantial portion of the West Milford area is occupied by public land owned by the City of Newark. "Essentially undeveloped, [that] land comprises much of the watershed that feeds Newark's reservoirs and ultimately provides water to consumers in the city." *Newark v. West Milford Township*, 7 *N.J. Tax* 35, 36 (1984).

West Milford was represented in that initial study effort by the West Milford Municipal Utilities Authority, a separate legal entity created pursuant to *N.J.S.A.* 40:14B-4, a provision of the Municipal and County Utilities Authorities Law. That Act authorizes a municipality to create such a municipal authority and charge it with responsibility for collecting, treating and disposing of the town's sewage. *N.J.S.A.* 40:14B-4, -19.

In 1968, the Study Committee issued a "Comprehensive Report on Sewerage Facilities" that proposed the development of a regional interim plan that would augment Pompton Lakes' existing facility and create a new facility to treat sewerage from Wanaque, West Milford and Ringwood. Believing that its interests would not be served by that plan, Pompton Lakes withdrew from the Study Committee. Because that initial report was funded in full by a $150,000 grant from the State Department of Health, that expenditure forms no part of this appeal.

The three remaining towns continued to participate in the Study Committee, which modified its plans in light of Pompton Lakes' withdrawal. In August 1969, Wanaque, Ringwood and the WMMUA adopted parallel joint resolutions authorizing the Study Committee to apply for a $457,000 loan from the State Department of Health. The parties agreed to contribute their proportionate share of the repayment of the loan, in the event it became necessary, "to the extent that it has benefited thereby and not

otherwise." The application was subsequently approved, and the State loaned the funds to the Committee. The money funded environmental and engineering studies in West Milford, Ringwood and Wanaque, as well as preliminary engineering plans and specifications for a regional sewerage system that would serve all three municipalities.

On January 6, 1971, following the conclusion of those preliminary studies, the Township of West Milford adopted an ordinance in concert with Ringwood and Wanaque consenting to the formation of a regional sewerage authority known as the Wanaque Valley Regional Sewerage Authority (WVRSA or Regional Authority). Because the West Milford Municipal Utilities Authority, created in 1964, had sole jurisdiction of the subject matter of sewage collection and disposal within the Township of West Milford, it was also necessary for that body to consent to the formation of the regional sewerage authority. *N.J.S.A.* 40:14B–19. As part of its formation, the WVRSA agreed to assume the debts of the Study Committee.

Once created, the WVRSA became a distinct and independent public entity "constituting a political subdivision of the State established as an instrumentality exercising public and essential governmental functions to provide for the public health and welfare...." *N.J.S.A.* 40:14A–7. Under the Sewerage Authorities Law, *N.J.S.A.* 40:14A–1 to –37, the WVRSA was financially independent, possessing its own power to raise revenue through service charges and the issuance of bonds. The Legislature provided a mechanism for a municipality or municipal authority to enter into contractual commitments with a regional sewerage authority. *N.J.S.A.* 40:14A–9 authorizes a local unit (a municipality or municipal utilities authority) to loan or donate monies to a sewerage authority as may be agreed upon between the local unit and the sewerage authority. *N.J.S.A.* 40:14B–49 provides for the entry of "service agreements" between a municipality or municipal utilities authority and a regional sewerage authority.

Pursuant to *N.J.S.A.* 40:14A–4(c), West Milford appointed representatives to serve on the WVRSA. However, West Milford never agreed to loan or donate funds to the Regional Authority nor did it enter into a service agreement with the Regional Authority. As noted, the Township did not have the authority to enter into a service agreement, having delegated sole jurisdiction over sewerage collection to its municipal utilities authority in 1964.

In 1972, the WVRSA proposed a service agreement to the West Milford Municipal Utilities Authority that would have provided for the establishment of charges, rates and payments for services by the Regional Authority. The Regional Authority, and the three municipalities through their respective municipal authorities, engaged in negotiations over the terms and conditions of that proposed service agreement. In 1976, the West Milford Municipal Utilities Authority advised the Regional Authority that it would not execute a service agreement or use the regional facilities for the treatment of its sewerage. Consequently, neither West Milford nor its municipal utilities authority ever entered into a service agreement with the WVRSA.

In 1981, Ringwood Borough decided not to enter into an agreement with the Regional Authority. As a result of those two events, it became necessary to redesign the planned sewerage treatment facility.

In 1986, the Wanaque Borough Sewerage Authority (WBSA) commenced this action against various parties, including the WVRSA, the Township of West Milford, the Borough of Ringwood and its sewerage authority, and the Borough of Wanaque, seeking reimbursement for certain of the WVRSA's costs. (As the sole customer of the WVRSA, the WBSA was the only entity left to absorb the planning expenses of the two decades.) The WVRSA, by cross-claim against the Borough of Ringwood, its sewerage authority, and the Township of West Milford, and by third-party complaint against the West Milford Municipal Utilities Authority, sought essentially the same relief as the WBSA. The WBSA and WVRSA claimed that costs were incurred not only for the plan-

ning, design, construction and operation of a treatment plant and system, but significant added costs were incurred because of the withdrawal of West Milford and Ringwood. The WBSA and WVRSA also alleged that West Milford and its municipal utilities authority were unjustly enriched by those studies.

The matter was tried without a jury in the Superior Court, Law Division, Passaic County. The trial court found that the Ringwood Borough Sewerage Authority was the only public body that had executed a contract with the WVRSA in accordance with the statutory requirements of *N.J.S.A.* 40:14B–49, and held the Ringwood Borough Sewerage Authority responsible for "its fair share of all costs incurred up to the date of its withdrawal from the WVRSA." The trial court dismissed the claims against the other entities, concluding that the WVRSA had presented no evidence that could support a theory of implied contract. It ruled that recovery against a governmental entity under a theory of implied contract is limited to those circumstances in which the entity "has the particular power to act and ... does enter into a contract [that] is for some reason found to be void but nevertheless the other contracting party having acted and extended itself in good faith is entitled to payment for those services or goods." The court also found that because the WVRSA had expressly agreed to assume the debts of the Study Committee, there could be no recovery under a joint venture claim.

On appeal, the Appellate Division reversed the trial court's dismissal of the claims against the Township of West Milford and its utility authority, finding that as long as a governmental entity is not statutorily prohibited from contracting on a subject, and it receives a benefit, it is liable to the extent of the "reasonable value of the services rendered." The court also concluded that the parties presented sufficient evidence at trial to require the trial court to have considered and ruled on the WVRSA's theory that the Regional Authority was the product of a joint venture among the constituent public entities. The Appellate Division noted that a finding of a joint venture would lead to common law remedies

being available to a participant in a joint venture upon wrongful termination of the joint venture by another participant. The court ordered that on remand "resulting losses or wasted expenditures, if any, not otherwise comprehended within the implied contract claim, but determined to result from wrongful termination by a joint venturer, shall also be considered."

We granted West Milford's petition for certification. 142 *N.J.* 458, 663 *A.*2d 1363 (1995). The West Milford Municipal Utilities Authority did not seek review of the judgment.·

## II

■ West Milford's principal argument is that it would be against public policy to allow imposition of liability against a public body if the correct statutory procedures for incurring debt were not followed. For example, if a governing body were to enter a contract without following proper procedures, it would be against public policy to allow any recovery. Public bidding laws must be strictly construed to prevent the unauthorized imposition of public liability. Such is definitely the case under federal law. Pursuant to the Tucker Act, 28 *U.S.C.* §§ 1346, 1491, Congress has waived sovereign immunity with respect to actions under express or implied contracts. "[N]umerous decisions have held that this waiver of sovereign immunity is limited to express contracts and contracts implied in fact and does not extend to contracts implied in law or founded upon equitable principles." *Knight Newspapers, Inc. v. United States,* 395 *F.*2d 353, 357 (6th Cir.1968) (citations omitted). Our law recognizes only very limited circumstances in which a third party may enforce a public contract adopted without procedural regularity. *See 405 Monroe ·Co. v. City of Asbury Park,* 40 *N.J.* 457, 466, 193 *A.*2d 115 (1963) (holding that disputed arrangement was lease and not prohibited installment sale). New Jersey law does, however, permit recovery "to the extent of [any] benefit conferred upon and knowingly accepted by the municipality." *Id.* at 463, 193 *A.*2d 115 (citation omitted). And when two contiguous municipalities have acted in

the common interest under a legislative grant of power, the contractual undertaking is to be assessed in terms of "the general public good and welfare." *Borough of West Caldwell v. Borough of Caldwell,* 26 *N.J.* 9, 31, 138 *A.*2d 402 (1958).

We must digress for a moment to review the terminology.

Contracts are traditionally classified as express, implied-in-fact or implied-in-law. The contract is express if the agreement is manifested by written or spoken words, and implied-in-fact if the agreement is manifested by other conduct. "Contract implied in law" is a somewhat disfavored synonym for "quasi-contract." The authorities agree that a quasi-contract is not a contract at all, since there is no actual manifestation of assent. The common law of quasi-contract is supposed to have developed for procedural reasons [there simply being no writ for the form of action into which such a claim could fall].

[Robert A. Long, Jr., Note, *A Theory of Hypothetical Contract,* 94 *Yale L.J.* 415, 415 n. 3 (1984) (citations omitted).]

Thus, contracts implied in fact are no different than express contracts, although they exhibit a different way or form of expressing assent than through statements or writings. Courts often find and enforce implied promises by interpretation of a promisor's word and conduct in light of the surrounding circumstances. *See Restatement (Second) of Contracts* § 4 comment a (1979); *id.* at § 5 comment a ("The terms of a promise or agreement are those expressed in the language of the parties or implied in fact from other conduct.").

A contract implied in the law is a bird of another feather. While it is commonly referred to as a quasi-contract, in reality it is not a contract at all.

As explained by the Court in *Saint Paul Fire & Marine Ins. Co.,* a quasi-contractual obligation is wholly unlike an express or implied-in-fact contract in that it is "imposed by the law for the purpose of bringing about justice without reference to the intention of the parties." 32 *N.J.* 17, 22, 158 *A.*2d 825 (1960).... "In the case of actual contracts the agreement defines the duty, while in the case of *quasi* contract the duty defines the contract." *Insulation Contracting & Supply v. Kravco, Inc.,* 209 *N.J.Super.* 367, 376, 507 *A.*2d 754 (App.Div.1986).

[*Saint Barnabas Medical Ctr. v. County of Essex,* 111 *N.J.* 67, 79, 543 *A.*2d 34 (1988) (citations omitted).]

■ The scope of the duty is a question of law to be decided by the court. In *Saint Barnabas Medical Center,* the duty was inferred from the public policies implicit in the various statutes and regulations pertaining to the provision of medical health benefit services to the inmates of county institutions. The rigidity of Anglo–American pleadings required some tangible basis for the enforcement of an implied-in-law contract. Without explicitly admitting that their decisions were based on notions of fairness and equity, courts "impose[d] a 'fictional' promise into the situation—where there was in fact none at all." Judy Beckner Sloan, *Quantum Meruit: Residual Equity in Law,* 42 *DePaul L.Rev.* 399, 408 (1992) (footnote omitted).

■ In essence, a contract action implied-in-law is a restitutionary claim. Like the equitable doctrine of restitution, the key element of a quasi-contract claim is that one party has been unjustly enriched at the expense of another. Recovery under both doctrines is typically measured by the amount the defendant has benefitted from the plaintiff's performance.

> In a truer sense the court can force the fictionally breaching party (i.e., the enriched party) to perform; the performance required is to compensate the injured party. [Frederic] Woodward, in his work *The Law of Quasi Contracts,* stated that there are only two "essential elements" of a contract implied in law: "(1) that the defendant has received a benefit from the plaintiff," and "(2) that the retention of the benefit by the defendant is inequitable."
>
> [*Ibid.* (citing Frederic C. Woodward, *The Law of Quasi Contracts* 9 (1913)) (footnote omitted).]

■ Applying those principles to the facts of this case leads us to affirm the Appellate Division on the issue of quasi-contract. The trial court was correct to conclude that without a promise there could be no contract. But that does not mean that without a promise there can be no duty.

The common law would have implied a fictional promise to remedy an unjust enrichment. The time has long since passed when law can or should rely on fictions. Chief Justice Weintraub once said that "fictions tend to intrude into situations for which they were not invented." *Michaels v. Brookchester, Inc.,* 26 *N.J.*

379, 385, 140 A.2d 199 (1958). Thus, in our most recent consideration of these issues in *Saint Barnabas Medical Center, supra,* we examined the nature of the services performed by the hospital, the extent of the duty of the County to provide those services, and the extent to which it benefitted by the performance of that duty by another party. 111 *N.J.* 67, 543 A.2d 34.

This case presents a complex set of interrelating statutes and regulations designed to reduce water pollution and provide the public with a safe and adequate supply of water. The Jeffersonian ideal of leaving all governance to the smallest units of government still has an abstract appeal. Adrienne Koch, *The Philosophy of Thomas Jefferson* 164–65 (1957) (describing Jefferson's belief in the necessity that republics be small). But it has become increasingly necessary in modern society for communities to form regional organizations to satisfy more efficiently their individual needs.

That the project did not turn out ultimately to serve the needs of the residents of West Milford does not detract from the fact that they received a benefit from the planning studies. Although the Township determined that it was better to go it alone, the environmental and engineering studies undoubtedly provided West Milford with valuable information that enabled it to reach that conclusion. We are informed that West Milford has been designated a conservation community for purposes of Mt. Laurel planning. In addition, the members of the WVRSA representing West Milford were surely conscious of those planning efforts as they progressed over the years. (West Milford continued to hold seats on the WVRSA and took no action to seek statutory dissolution from its inception in 1971 through the various stages of this litigation.) Hence, we agree, in the circumstances of this case, that it is fair to impose some liability on West Milford for the expenses associated with those planning studies. As noted, "in the case of *quasi* contract the duty defines the contract." *Saint Barnabas Medical Center, supra,* 111 *N.J.* at 80, 543 A.2d 34 (quoting *Insulation Contracting, supra,* 209 *N.J.Super.* at 376, 507 A.2d 754 (citation omitted)). We have no doubt that West Milford

had a duty to its citizens to explore the provision of safe and healthful waste water treatment facilities.

We disagree with the Appellate Division, however, that the case should be remanded for a determination of whether the WVRSA has established West Milford's liability on a joint venture theory. The trial court found that the Study Committee was "undoubtedly" a joint venture, but concluded that the agreement by the WVRSA, the successor enterprise, to assume the Study Committee's debts relieved the Committee of its financial obligations. The relationship among the parties to the WVRSA is defined clearly by statute. The manner in which a regional sewerage authority is formed, the respective rights and obligations of the entities consenting to the formation of the authority, and the methods by which the authority may finance its obligations are expressly dealt with in *N.J.S.A.* 40:14A–1 to –37. Specific statutory provisions govern the dissolution of a regional sewerage authority and the responsibilities of the municipalities forming that authority upon its dissolution. *N.J.S.A.* 40:14A–4(h). It is difficult to see how a joint venture could be implied in fact when the only expressions thereof are those that established the Regional Authority. If there is to be such a thing as a joint venture implied in law, we fail to see how the terms of such an implied joint venture could differ materially from those created pursuant to a quasi-contract theory of recovery.

There is merit to the argument that whatever duty might be implied in law should be imposed upon the public body with the authority to provide the sewer service—in this case, the West Milford Municipal Utilities Authority. However, if equity is the measure of the duty, it would seem to us inequitable to impose the duty on the municipal utilities authority. We were informed at oral argument that only about ten per cent of West Milford's 7,000 dwelling units are served by the West Milford Municipal Utilities Authority. Thus, the entire financial burden would fall upon a small sector of the community. Although the Wanaque watershed could serve about one-half of the area of West Milford, the studies

benefitted all residents of the municipality to a greater or lesser degree. Therefore, all residents of West Milford should share in the burden of paying for the cost of those studies.

A final concern: Because we are dealing with matters of equity, we believe that it might be unfair to require West Milford to pay interest on the amounts claimed as though the money had been loaned to West Milford and it had the use and enjoyment of the money during the pendency of the litigation. *See A.J. Tenwood Assocs. v. Orange Senior Citizens Hous. Co.*, 200 *N.J.Super.* 515, 525, 491 *A.*2d 1280 (App.Div.) (declaring that appellate courts should "defer to the trial court's exercise of discretion involving prejudgment interest unless it represents a manifest denial of justice."), *certif. denied*, 101 *N.J.* 325, 501 *A.*2d 976 (1985). It appears to us that each of the parties share some responsibility for failing to have resolved this matter long ago. It must have been apparent as early as 1976 that the regional sewerage authority was not holding together. There may be some inequity suggested in that the trial court entered judgment against the Ringwood Borough Sewerage Authority *with* interest; however, the Ringwood Borough Sewerage Authority actually entered and breached a service agreement with the WVRSA, which places it in a slightly different position than West Milford. We leave to the Law Division an assessment of the equities as to whether prejudgment interest or a schedule of payments should be allowed.

The judgment of the Appellate Division is affirmed insofar as it would allow the WVRSA to recover in quasi-contract from the Township of West Milford and reversed insofar as it would allow such recovery under a theory of joint venture. The matter is remanded to the Law Division for further proceedings in accordance with this opinion.

*For affirmance in part; reversal in part*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.