THE CITY OF EAST ORANGE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. LLOYD W. McCORKLE, COMMISSIONER OF THE DEPARTMENT OF INSTITUTIONS AND AGENCIES OF THE STATE OF NEW JERSEY; THE COUNTY OF ESSEX, A BODY POLITIC OF THE STATE OF NEW JERSEY; THE ESSEX COUNTY WELFARE BOARD, A BODY POLITIC OF THE STATE OF NEW JERSEY; JOHN A. KERVICK, STATE TREASURER, DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY; THE HOSPITAL CENTER AT ORANGE; AND EAST ORANGE GENERAL HOSPITAL, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 13, 1967—Decided January 16, 1968.

Before Judges KILKENNY, CARTON and FULOP.

*Mr. William L. Brach* argued the cause for appellant.

*Mr. Eugene T. Urbaniak,* Deputy Attorney General, for respondents Lloyd W. McCorkle and John A. Kervick (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

*Mr. Vincent P. Torppey* argued the cause for respondent County of Essex (*Mr. Nicholas T. Fernicola,* Essex County Counsel, attorney).

*Mr. Felix A. Martino* argued the cause for respondent Essex County Welfare Board (*Mr. John A. Matthews, Jr.,* attorney).

*Mr. Everett M. Scherer* argued the cause for respondents The Hospital Center at Orange and East Orange General Hospital (*Messrs. Riker, Danzig, Scherer & Brown,* attorneys).

The opinion of the court was delivered by

CARTON, J. A. D. This action was instituted by the City of East Orange to determine the respective responsibilities of the city, the County of Essex, the Essex County Welfare Board and the State of New Jersey, for paying the costs of hospital care[1] of persons covered by certain public assistance programs. Originally brought in the Superior Court, Law Division, it was determined that the action in part constituted an attack upon certain rules and regulations of a state administrative agency properly to be heard, pursuant to *R. R.* 4:88–8 and 4:88–10, in the Appellate Division. A motion to consolidate the remainder was granted and the entire case brought here on an agreed statement in lieu of record.

Involved herein is the interrelationship of those statutory programs of public assistance administered by the welfare board of each county and those administered and paid for at the municipal level. Because the county programs

[1] The term "hospital care," as used in this opinion and as agreed by the parties, includes hospital care and medical and surgical care incident thereto, both for in-patients and out-patients who utilize the hospital facilities and clinical services, and includes all expenses or charges involved or entailed in providing for the hospital needs of the persons who are the subject of this action.

embrace only individuals coming within certain defined categories—*e. g.,* the aged, the blind, dependent children—they are commonly referred to as "categorical assistance." The municipal responsibility is broader in scope for it covers all aid to the needy not otherwise provided, and hence has been designated "general public assistance."

Specifically, the city contends that hospital care rendered to persons eligible for aid under categorical assistance should be paid for by the county rather than by the municipality under general public assistance. The city advances as a secondary argument that if it is deemed responsible for providing hospital care to these persons, the Legislature has mandated that the State reimburse it for a certain percentage of the *actual cost* of such care. On this basis the city contends that the regulation of the Department of Institutions and Agencies limiting reimbursement to a percentage of $10 per day for a period of 30 days is invalid. The validity of these contentions turns upon the proper interpretation of the statutory provisions establishing and implementing these various programs.

Defendants are the Commissioner of the Department of Institutions and Agencies, overseer of New Jersey's welfare programs; the State Treasurer; the county, bearer of financial responsibility for categorical assistance; the Welfare Board, administrator for categorical assistance; and two voluntary hospitals which have provided care to certain dependent children. All defendants except the hospitals deny that categorical assistance includes provision for hospital care for those covered by the programs and, therefore, that such care remains the responsibility of the city under general public assistance. The hospitals are neutral on this issue; they are concerned, however, that the costs due them be paid by some level of government. The hospitals support the city's attack on the limiting regulation, while the county and the Welfare Board take no position on that point.

I

A brief introduction to the complex statutory scheme of both general and categorical public assistance is necessary to a resolution of the issues before us. First, it must be recognized that the primary duty for furnishing public assistance has since early times been cast upon the municipalities of this State. The Legislature has incorporated this underlying principle as a declaration of its public policy in the General Public Assistance Law:

"44:8–109. Public policy regarding assistance to needy persons

It is hereby declared to be the public policy of this State that every needy person shall, while in this State, be entitled to receive such public assistance as may be necessary, and that the furnishing of such public assistance is primarily the duty of the municipalities and of civic and charitable organizations but that all needy persons not otherwise provided for under the laws of this State shall hereafter receive public assistance pursuant to law and the provisions of this act."

Those responsibilities imposed on the municipalities under this basic policy are delineated in *N. J. S. A.* 44:8–107 *et seq.*

The areas or categories of county assistance, on the other hand, are found under several headings in *Title* 44 of the *Revised Statutes,* and each represents a new sphere of responsibility at the county level and thus an area carved out of the municipal burden. The first of these categorical programs in point of time was old age assistance, *N. J. S. A.* 44:7–1 to 37 (1936), providing aid to needy persons over 65. This was followed by disability assistance, *N. J. S. A.* 44:7–38 to 42 (1951), providing aid to disabled persons between 18 and 65; assistance for dependent children, *N. J. S. A.* 44:10–1 *et seq.* (1959), aiding needy children; assistance to the blind, *N. J. S. A.* 44:7–43 to 50 (1962), assisting those over 18 and blind; and medical assistance for the aged, *N. J. S. A.* 44:7–76 to 84 (1962), entitling residents over 65 to medical assistance.

All of these categorical assistance programs are linked together by cross-reference to the original program, old age assistance. Since the newer statutory designs simply designate and define the newly-included categories and provide by reference that these forms of aid shall be administered pursuant to the provisions of the old age assistance program, it is that law that is of primary concern, although old age assistance itself is not at issue here. See *N. J. S. A.* 44:7-39, 44 and 79, and 44:10-2 (the cross-reference provisions of the newer programs).

The city takes the position, generally, that when each of these newly included categorical assistance programs was adopted, the Legislature implicitly cast upon the State and the Welfare Board the responsibility of providing for *all* of the needs of these persons, including medical services and hospital care, and thus removed this area of public assistance from the domain of the local municipality.

The city arrives at its conclusion that categorical assistance includes medical services (and therefore hospital care as a phase of medical services) by reason of the interpretation which it avers must be placed upon the language of *N. J. S. A.* 44:7-12, the statutory section defining and describing the extent of relief provided under all forms of categorical assistance. Its entire case rests upon the validity of this position.

That section, in pertinent part, reads as follows:

"The county welfare board * * * shall extend to those persons found to be eligible * * * assistance adequate to provide for their reasonable maintenance and well-being. * * * [A]ssistance shall be granted in the form of cash or check. *Necessary medical and health services and supplies may be granted in addition thereto in accordance with the regulations of the State division* [Department of Institutions and Agencies]. * * * Such assistance shall be provided for the recipient only while living in his own or some other suitable family home or approved institution * * *." (Emphasis added)

In particular, the city asserts that the italicized sentence was not designed, as defendants insist, to confer discretion upon

the Commissioner as to whether such assistance should be granted, but was intended merely to provide the mechanics by which payment for those services could be made.

The ultimate question thus narrows down to a determination of the meaning of this particular statutory provision. In arriving at that determination we must resort not only to the language itself, but to its historical background, other related provisions of both federal and state statutes, and important policy considerations.

 The meaning of *N. J. S. A.* 44:7–12 seems plain on its face. Each county welfare board is commanded to provide for the "reasonable maintenance and well-being" of those eligible for categorical assistance. The statute then provides, in two parallel sentences, that (1) assistance, which means "money payments" (*N. J. S. A.* 44:7–1), *shall* be provided by cash or check, and (2) medical and health services *may* also be provided. The juxtaposition of the words "shall" and "may" must be regarded as significant. There can be no dispute that the word "shall" is mandatory. We think it clear also that the word "may" was used in the statute in its ordinarily permissive sense. See *Leeds v. Harrison,* 9 *N. J.* 202 (1952); *Harvey v. Employees Retirement System of Essex County,* 30 *N. J.* 381 (1959). Absent clear proof that another meaning was intended, we would, on this alone, be constrained to interpret the statute as permitting, but not requiring, provision of medical and health services.

The proper interpretation need not rest on the plain language of this basic provision alone. Other provisions of related statutes point in the same direction. For example, *N. J. S. A.* 44:7–13 provides that the county welfare board *may* pay "terminal medical and nursing expenses" incurred by recipients of old age assistance. This provision would be unnecessarily repetitious if payment of medical expenses were mandatory under *N. J. S. A.* 44:7–12.

Again, *N. J. S. A.* 44:7–34 provides that no recipient of categorical assistance, "while receiving the same, shall

receive any other assistance from the state or any political subdivision thereof *except for medical and surgical care.*" (Emphasis added). Thus, no person is permitted to receive both categorical assistance and aid in any other form, with a specific exception for medical care. The inference is that medical care is not mandatory under categorical assistance. If it were, this statute, although prohibiting multiple benefits, would expressly authorize multiplicity for medical care. That such a reading is unlikely seems obvious.

■ Finally, *N. J. S. A.* 44:7–12 itself states that categorical assistance "shall be provided for the recipient only while living in his own or some other suitable family home or approved institution." This provision is mandatory and absolute in its terms; no benefits can be provided to one living elsewhere. The term "institution" is defined by *N. J. S. A.* 44:7–1 in a manner hardly likely to apply to hospitals; rather, that definition and the context quoted above convey the idea of an establishment such as a "nursing home" or something similar thereto. In addition, this part of the statute refers to the listed places as those in which the recipient is "living." The term "living" carries a connotation of permanent habitation rather than the temporary stay usually associated with the idea of a stay in a hospital. These elements lend some credence to defendants' position that medical care is not mandatorily included under categorical assistance.

Beyond the mechanics of our own statutory design, we observe also the federal statutes which provided the genesis of our programs by providing funds to the states and delineating the general terms and conditions for receiving those funds. Of particular interest is 42 *U. S. C. A.,* § 306 (a), in which Congress defined "old age assistance":

"[T]he term 'old-age assistance' means money payments to, or * * * medical care in behalf of or any type of remedial care recognized under State law in behalf of needy individuals who are sixty-five years of age or older * * *."

Compare with that the following language of *N. J. S. A.* 44:7–1:

" 'Old age assistance' means assistance [defined as 'money payments to or on behalf of eligible persons'] to aged needy persons * * *."

It is immediately apparent that there is great similarity of language, as is often the case when state laws are adopted to implement federal grants.

Although the language of the New Jersey statute parallels that of the federal statute, conspicuous by its omission from our statute is the federal definition of "old age assistance" to include medical care. The fact that our Legislature employed almost the same language as Congress did in defining "old age assistance," yet omitted the reference to medical care further indicates a legislative intent that such care not be included as categorical assistance. A similar omission can be noted in a comparison of state and federal definitions of disability assistance (42 *U. S. C. A.*, § 1355), assistance for the blind (42 *U. S. C. A.*, § 1206), and assistance for dependent children (42 *U. S. C. A.*, § 606(b)). We must assume such omissions were intentional and not the result of inadvertence.

The historical setting out of which the various forms of public assistance arose must also be considered. In 1936 when the first categorical program (old age assistance) was enacted following the federal provisions for Social Security, there existed in New Jersey a comprehensive program aiding the needy, the history of which reaches back a great many years. It is clear that in the earlier statutory schemes for providing public assistance hospital care was not considered an ordinary need and it was not provided as a normal part of the general programs for assisting the poor. Provisions for what were regarded as extraordinary or added needs appear as wholly distinct programs, separately administered from those programs granting general relief. For example,

*chapters* 5 and 6 of *Title* 44 of the *Revised Statutes* dealt exclusively with medical, dental and hospital care of the poor and the distribution of the costs thereof to municipalities and counties. See also the separate provisions for medical facilities contained within the more general relief provided by the old Poor Laws under *R. S.* 44:1–152, 153 and 154.

An analysis of the statutory origin of the reference to medical care, viewed in the light of this historical background, lends further support to this interpretation of *N. J. S. A.* 44:7–12. The sentence, "Necessary medical and health services and supplies may be granted * * *," was not part of the 1936 act. It was not until 1944 that this new concept was added by *L.* 1944, *c.* 84, § 2. Prior to the amendment the statute, consistent with the historical separation of medical care and general welfare which we noted above, contained no reference to provision of medical assistance. Since there was no preexisting requirement that medical services and supplies be provided under categorical assistance, this amendatory legislation can only be read as permitting for the first time a *voluntary* undertaking by county welfare boards toward the establishment of health services.

The Statement accompanying the amendatory bill (Assembly Bill 147 of 1944) further confirms this view:

"This bill is designed * * * to enable county welfare boards to develop plans for providing medical and health services and supplies by direct payment to physicians, pharmacists, dentists, nurses, etc. * * *"

Thus, as enabling legislation the provision must be deemed permissive rather than mandatory. The city's argument that this 1944 amendment was permissive only as to the method of payment—*i. e.,* direct to the vendors of medical services—but not as to provision of the services themselves, must therefore fail. The amendment clearly imported the

concept of *medical help through vendor payments* in its entirety—not merely the concept of *vendor payments* alone as the city maintains.

Nor does this interpretation of the statute destroy the uniformity of administration of categorical assistance programs as the city suggests. The uniformity required by the federal statute refers only to those benefits which the State has chosen to provide. See, *e. g.,* 42 *U. S. C. A.,* § 302(a). Since medical aid has not been mandated by our statutes, the uniformity requirement is inapplicable.

Lastly, we cannot ignore the fact that the categorical assistance program, in Essex County and throughout the State, has been in operation for over 20 years without challenge. This must be taken as tacit recognition that the State's interpretation is in accord with the legislative design. We have been shown no compelling reason for disturbing this established practice.

■■ We hold, therefore, that the Welfare Board is not required to provide hospital care to the recipients of disability assistance, assistance for dependent children, or assistance to the blind. Such assistance may be granted in accordance with the regulations of the Department of Institutions and Agencies as provided in *N. J. S. A.* 44:7–12. It follows that this area of relief remains within the broad coverage of the General Public Assistance Law (*N. J. S. A.* 44:8–107 *et seq.*) which, by virtue of *N. J. S. A.* 44:8–147, makes the municipality responsible for the hospital care of its indigents for whom care is not otherwise provided.

Our resolution of this question makes it unnecessary to discuss the State's argument that hospital care does not fall within the statutory language "medical and health services and supplies." Nor need we advert to the city's argument with respect to the time limitations placed upon such aid. Obviously, if this aid is purely discretionary, the period during which it shall be given may be delimited.

## II

As its secondary argument, the city maintains that even if it is responsible for the costs of hospital care of persons covered by categorical assistance, the Legislature has provided that it shall be reimbursed by the State for 40% of the actual costs of such assistance. The State contends that its regulation M. A. 2.301, limiting the city to a maximum reimbursement of 40% of $10 per day for a period of 30 days or less, is valid and not an abuse of the Commissioner's discretion.

It is not disputed that the Commissioner is vested with certain discretionary powers in the administration of state aid to municipalities under the General Public Assistance Law (*N. J. S. A.* 44:8–107 to 145). For example, *N. J. S. A.* 44:8–111(d) provides that the Commissioner shall promulgate such rules and regulations "as may be necessary for the administration of State aid." Again, under *N. J. S. A.* 44:8–113(a) he may prescribe "rules and conditions under which the funds allotted for State aid shall be administered." The issue here is whether the Commissioner's discretion extends to a determination of the *amount* each municipality is to receive as well as to how the funds received are to be administered.

*N. J. S. A.* 44:8–128 and 129 establish a formula for determining the amount of state aid to which a municipality is entitled. Briefly described, the first section cited requires the Commissioner to ascertain as to each municipality certain monetary items: (a) preceding year's ratables (a valuation of taxable properties); (b) preceding year's public assistance load (the cost of public assistance for the past year); (c) current year's public assistance load (that cost for the present year), and (d) preceding year's public assistance millage (a levying formula, the exact particulars of which are not important here). The companion section set forth in *N. J. S. A.* 44:8–129 determines the amount of state aid which the Commissioner shall distribute. In the

case of the City of East Orange that amount is 40% of the "current year's public assistance load."

It is clear that these statutes confer upon the Commissioner no discretion as to whether he shall pay or how much he shall pay. He is thus directed to distribute 40% of the amount of the "current public assistance load"; he must comply with the legislative imperative after the amount of that load has been calculated in accordance with the statutory formula. Therefore, if hospital costs are properly construed to be part of the "current public assistance load," 40% of that sum must be paid and the Commissioner is powerless by regulation or otherwise to reduce or limit the amount of the legislative bounty.

Reference must therefore be made to the General Public Assistance Law. That law, as originally enacted in 1947, did not provide for payment by municipalities of the costs of hospital care of those persons covered by general public assistance. In 1950, by *L*. 1950, *c*. 303, §§ 1 through 7, the Legislature imposed upon municipalities in counties of the first class the added burden of paying for the "medical and surgical treatment * * * required by a person entitled to public assistance as such term is defined in the General Public Assistance Law." *N. J. S. A.* 44:8–147. Although the 1950 enactment fails to state expressly that this added form of public assistance is included in the "public assistance load" described in the General Public Assistance Law, we think the content of the later act clearly implies such a result.

We must not overlook the numerous references in the 1950 statute to the administrative scheme of the prior law. For example, *N. J. S. A.* 44:8–147 provides:

"[S]uch person may be admitted to a public or voluntary hospital in the municipality in which he is found * * * or to such other hospital as may be approved by such official or officials as may be charged with the administration of public assistance pursuant to the General Public Assistance Law * * *."

Again, in that same section, it is stated:

"[T]he said official or officials shall proceed and provide for the relief of said person in the manner provided by said General Public Assistance Law. * * *"

Nor may we disregard the fact that the Department of Institutions and Agencies itself has impliedly recognized that the 1950 statute has been incorporated into the general public assistance program. Regulation M. A. 2.301 purports to limit the reimbursable allowance for hospitalization to $10 per day, but the Department applies *N. J. S. A.* 44:8–129 to further limit reimbursement to 40% of that sum. This application of part of the General Public Assistance Law to costs incurred under the provisions of the 1950 act buttresses the conclusion that the Legislature intended that the cost of hospitalization provided to persons covered by general public assistance be included as part of the "public assistance load" for which the municipality must be reimbursed by the State.

■ In effect, the Commissioner has attempted to set a limit upon reimbursements. This he may not do. The reimbursement formula is absolute and mandatory under *N. J. S. A.* 44:8–128 and 129. While the Commissioner has discretion with respect to the *administration* of state aid, he has none whatsoever with respect to a determination of the *amount* of that aid.

■ Similar to the 40% reimbursement set forth in *chapter* 8 is an 80% reimbursement provided by *chapter* 8A of *Title* 44. Specifically, *N. J. S. A.* 44:8A–33 provides for the relief of persons having no legal settlement in New Jersey. The municipality in which such persons are found is required to furnish public assistance to them, "subject to reimbursement by the State to the extent of eighty per centum (80%) of the total cost of such assistance * * *." Since, in municipalities in counties of the first class, this obligation includes the duty to furnish hospital care pursuant to *N. J. S. A.* 44:8–147, we believe the city is entitled to be

reimbursed "(80%) of the *total cost* of such assistance" (emphasis added). Here again the Commissioner has attempted to limit that reimbursement by Regulation M. A. 2.301 to 80% of $10 per day.

What we have said with respect to the 40% reimbursement applies with equal force to the 80% provision. We note similar cross-referencing in *N. J. S. A.* 44:8–147 to *chapter* 8A as that previously discussed with respect to chapter 8. Furthermore, the Department of Institutions and Agencies has recognized the applicability of the 80% formula in reimbursements under chapter 8A, just as it recognized the 40% formula under *chapter* 8.

We therefore conclude that the costs of providing hospital care to those covered by the General Public Assistance Law constitute part of the "public assistance load" for which the city is entitled to reimbursement of 40% of the sum it pays for such care. Likewise, hospitalization costs incurred under *chapter* 8A for the care of nonresidents is included within the "total cost" of assistance rendered to those persons, and the city is entitled to be reimbursed to the extent of 80% thereof. This being so, there is no authority in the Commissioner to promulgate Regulation M. A. 2.301 attempting to set a limit upon these reimbursements, and that regulation must be declared invalid.

 The Commissioner refers to the limited funds appropriated by the Legislature for these purposes and claims he is unable to pay more than the amount of such appropriation, notwithstanding the provisions of the law. This court, of course, may not order the Legislature to provide more money. However, the Legislature has the requisite power to provide the funds necessary to enable the Commissioner to comply with the obligation imposed upon him. It also has the power to modify the extent of that obligation if it deems compliance therewith to be unduly burdensome from a fiscal standpoint.

The specific questions presented in the agreed statement of facts are determined as follows:

(1) The Essex County Welfare Board's responsibility for persons and families eligible and approved for assistance for dependent children does not include an obligation to pay for hospital care provided to such persons in voluntary hospitals. The municipalities are accordingly not relieved of the obligation to pay for such care.

(2) and (3) These inquiries are predicated upon the assumption that the county or its Welfare Board is responsible for providing such hospital care. In view of our reply to the first question, they have become moot.

(4) The City of East Orange is entitled to reimbursement from the State at the rate provided in *N. J. S. A.* 44:8-129 applied to the city's actual expenditures for hospital care.

(5) Official regulation 2.301, revised 5/62, of the New Jersey Department of Institutions and Agencies, Bureau of Assistance, providing for a maximum amount of $10 a day for hospital costs, is declared void.