158 N.J. Super. 556 (1978)
386 A.2d 900
PERTH AMBOY GENERAL HOSPITAL, ET AL., PLAINTIFFS,
v.
BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF MIDDLESEX, NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided April 11, 1978.
*557 Mr. Eugene M. Haring for plaintiffs (Messrs. McCarter & English, attorneys).
Mr. Francis C. Foley for defendant (Mr. Herman B. Hoffman, Middlesex County Counsel, attorney).
Mr. Martin Verp, Passaic County Counsel, submitted a brief amicus curiae.
COHEN, J.C.C. (temporarily assigned).
This action seeks to establish that Middlesex County is obliged to pay for the inpatient hospital care of certain nonpaying county residents. Plaintiffs are the three major local nonprofit hospitals. The matter is here on cross-motions for summary judgment. There are no factual differences of any consequence.
The claim by the hospitals against the county arises because there are some needy patients for whom the hospitals provide free inpatient care and for whom they are not reimbursed by Medicaid, Medicare or any other form of public assistance. They are only partially reimbursed by the county. The hospitals claim an unrecovered cost greater than $.5 million a year. They assert that the county is obliged fully to repay the hospitals at rates set by the Commissioner of Health and to appropriate enough money to do so. The county argues that its appropriations for the hospitals are voluntary only and that it is not duty-bound to do anything at all.
*558 In 1968 a written agreement was made between plaintiff hospitals, two other hospitals and the county. It set forth procedures for distribution of funds by the county. The agreement had no termination date. Both sides agree that it is now voidable by any party.[1] The agreement is currently being treated by the parties as something in the nature of a nonbinding administrative convenience. For the current budget year the county has appropriated some $850,000 for the hospitals and has represented to the court that cancellation of the 1968 agreement either by a party or by this court would not cause it to withdraw those funds.
Some history is necessary. Before 1968 the county annually audited the hospitals and reimbursed them for their claimed losses for free care. The annual cost to the county was reduced by the enactment of Medicare in the early 1960s, but it nevertheless rose gradually until it reached $1 million. The freeholders suspected that full reimbursement relaxed hospital vigilance to collect from reluctant but able families. They felt that providing only partial repayment might make the hospitals more reluctant to accept readily a patient's claim of inability to pay.
Against that background the 1968 agreement was made. It recites statutory authority for county payments to hospitals[2] and establishes procedures for application, auditing, apportionment and payment by the county of such sum as it might *559 appropriate from year to year for the purpose. It gives the county, rather than the hospitals, the right to seek reimbursement from the patient for whose care county funds are paid. See N.J.S.A. 44:5-19.1. Essentially, the procedure established in the agreement is for the hospital to apply for credit for free care of a needy patient. There is a means test that was made up for the purpose and which has no necessary relationship to any test for eligibility for any other form of public assistance. If the county adjuster, who administers the program for the county, is satisfied the care qualifies for credit, it is figured in. Mechanisms are established for the county to apportion the appropriated funds among the hospitals on the basis of the previous year's share of the burden of free care.
During the decade of this agreement the county has knowingly and intentionally appropriated sums that were insufficient to defray the hospitals' claimed costs of free care. The hospitals have nonetheless provided the care and, in partial consequence, say they have incurred substantial and repeated operating deficits.
For years there did not seem to be much that could be done, other than to lobby the freeholders for greater appropriations. The problem was that the statutory language authorizing county aid plainly was permissive only and created no duty on the part of the county to appropriate greater amounts.
There is a series of Poor Law provisions, not all dovetailing very well, that permits a county to make appropriations for charitable hospitals in various ways:
(a) It "may" appropriate $1.5 million a year (if over 300,000 in population) to be "applied to the purpose of supporting and maintaining such patients as may be sent to any [nonprofit] hospital * * *." Such payments are to be apportioned among hospitals according to the number of "free ward day's treatment" each has afforded county residents. N.J.S.A. 44:5-11 and 12.
*560 (b) It "may" appropriate moneys for the construction or enlargement of charitable hospitals, N.J.S.A. 44:5-14, without apparent statutory limit.
(c) It "may," if its population is less than 925,000, appropriate 1/10th of 1% of the total assessed value of property therein, to be used to defray the annual operating deficits of hospitals caring for the poor and indigent. N.J.S.A. 44:5-16 A.
(d) It "may," if its population is less than 925,000, appropriate 1/10th of 1% of the total assessed value of property therein, to be paid to hospitals providing free care to the poor and indigent and at a set daily rate. This provision is expressed to be exclusive with the one just above and no hospital can be paid under both. N.J.S.A. 44:5-16 B.
(e) It "may," if its population reaches 925,000, support indigent patients at any hospital with 50 or more beds, at ward rates, N.J.S.A. 44:5-17, and may appropriate up to $10,000 per hospital for the purpose. N.J.S.A. 44:5-18.
(f) It "may" appropriate up to $10,000 each year for indigent psychiatric patients under eligibility rules set by the freeholders. N.J.S.A. 44:5-18.1.
(g) It "may," if a fourth or sixth class county, appropriate up to $15,000 a year per hospital, for the care of patients sent there. N.J.S.A. 44:5-19.
The permissive and discretionary nature of the county's authority to aid hospitals providing free care was plain. It was plain from the repeated use of the word "may." It was plain from the overlapping and either cumulative or inconsistent areas of permission granted. And, if further assurance were needed, it was provided by the simultaneous existence, in the same chapter of the Poor Law, of provisions granting municipalities the same kind of authority to appropriate for the purpose of reimbursing hospitals for their providing free care to the poor and indigent, N.J.S.A. 44:5-2, and 5-10 and 5-10.1, to make contracts for the *561 purpose, N.J.S.A. 44:5-3 et seq., and to make appropriations to aid construction and enlargement of local hospitals. N.J.S.A. 44:5-10.2. If the provisions for county aid appropriation were to be read as mandatory, the parallel municipal aid provisions would have to be read as mandatory, too. The Legislature obviously did not intend such a silly result. See, also, N.J.S.A. 44:X-XXX-XXX.
In the late 1960s a new effort was made. The New Jersey Hospital Association negotiated with Blue Cross to include in its proposed rates an amount for the unrecovered costs of providing indigent care. In 1969 Blue Cross agreed to do so, to the extent of $2.5 million state-wide. After opposition by the Public Advocate, the State refused to permit the inclusion.
1971 brought the hospitals a new ray of light. In that year the Health Facilities Planning Act, N.J.S.A. 26:2H-1 et seq., became law. In it the Commissioner of Health was given new and broad authority to regulate the delivery of health care services and the operations of health care facilities. Among the Commissioner's new powers was N.J.S.A. 26:2H-18(b), which says:
Payment by government agencies for health care services provided by a health care facility shall be at rates established by the commissioner, based on elements of costs approved by him.
Under the act, counties are government agencies and inpatient hospital care is a health care service provided by a health care facility. Thus, the quoted section says that payment by counties for inpatient hospital care shall be at rates established by the Commissioner. Nothing permissive about that language, argued the hospitals, who believed the new mandatory provision also made mandatory the formerly permissive language of N.J.S.A. 44:5-11 et seq. But see Henninger v. Bergen Cty., 3 N.J. 68, 71 (1949).
One problem was that the Commissioner did not do anything about setting payment rates. He did, however, adopt a regulation, solely under a general authority to adopt implementing *562 rules and regulations, N.J.S.A. 26:2H-5, that appeared to require hospitals to provide free care for the poor:
All hospitals shall be expected to provide care for the needy sick * * *. [N.J.A.C. 8:43(B)-1.11(i)]
Faced with a regulation that "expected" them to provide free care, a board of chosen freeholders that would not fully repay them for doing so, and a Commissioner who would not set payment rates, the hospitals, in 1974, sought judicial relief.[3] They started in the Law Division and were transferred to the Appellate Division. While the matter rested there, the Commissioner adopted a regulation establishing payment rates for needy care. Since one of the two prayers for relief was satisfied by the Commissioner's action,[4] the complaint of the hospitals was dismissed without prejudice.[5] During the same general time period the Attorney General issued his Formal Opinion No. 9-1976. In it he said that the repayment rates set by the Commissioner under N.J.S.A. 26:2H-18(b) had to be followed by counties making payments under N.J.S.A. 44:5-11 et seq., up to the ceiling of allowable appropriations. Yet, the County of Middlesex continued to follow the agreed procedures under the 1968 agreement, apportioning the sum it chose to appropriate among the five local hospitals according to the numbers of *563 free days' care furnished by each. And, it continued to appropriate a sum far below the statutory ceiling.[6]
And so, the hospitals returned to court. They argue here that the Legislature has now committed to the Commissioner of Health the responsibility for the regulation and improvement of health care. Among other things, that responsibility includes rate-setting for payments by governmental units for needy care. The Commissioner has set such rates. The hospitals are "expected" by the Commissioner to provide free care for the needy. The counties, who traditionally have been expected by the hospitals to repay them the unrecovered cost of such care, are now obliged by the combination of statute and regulation to repay at the set rates without limitation.
The result sought by the hospitals may well be a socially useful one. It may well be more sensible to distribute the cost of free care over the taxpaying public than selectively to burden the sick and injured and their insurors.[7] Quite plainly, however, the law is otherwise.
As explained above, there is really no doubt that the statutes authorizing county payments to hospitals give the freeholders the right but not the duty to appropriate and apportion public funds. If they were held to create a duty, it would be a peculiarly contradictory and self-duplicating one. It would be mirrored almost precisely by the parallel provisions regarding municipalities. More, these provisions. *564 so clearly inviting choice and option, were amended in immaterial particulars after enactment of the Health Facilities Planning Act, indicating that the Legislature had not forgotten them, knew what they said and did not intend to alter their optional nature.[8]
A brief analysis of public assistance programs makes all this clear. The everchanging series of welfare programs is not easily summarized. It involves every level of government. The foundation is the municipality. The General Public Assistance Law declares it to be this State's public policy that every needy person receive public assistance and that if he is not covered by other state law, he is the responsibility of municipalities and private charity. N.J.S.A. 44:8-108 and 109. Later sections detail provisions for state aid to municipalities providing aid. Municipalities in counties of the first class are specially directed to provide or pay for hospital care for persons entitled to general public assistance. N.J.S.A. 44:8-146 to 152.
The State also provides assistance to specific categories of the needy, namely, the aged, the blind, the totally disabled, families with dependent children and families of the working poor. For general history, see Governor's Task Force on Welfare Management, A State Welfare System for New Jersey (1971); East Orange v. McCorkle, 99 N.J. Super. 36 (App. Div. 1968). In that pre-Medicaid and pre-Health Facilities Planning Act case, the question arose whether the county was responsible for the cost of hospital care rendered recipients of categorical assistance. The municipality argued that, although it might be the ultimate foundation of public assistance, the county was responsible for the hospital costs of the categorically assisted under a statutory provision relating to county welfare boards that provided:
Necessary medical and health service and supplies may be granted in addition [to cash grants]. [N.J.S.A. 44:7-12] *565 The court held that the use of the permissive "may," absent clear proof of other intention, itself required the authority to be interpreted as permissive and not mandatory. It found no evidence of legislative intent that the administration of the categorical assistance programs at the county level should oblige the welfare board to pay for inpatient hospital treatment of recipients. Because the welfare board was not required to provide hospital care, it followed that the municipalities had to do so under the General Public Assistance Law and specifically under N.J.S.A. 44:8-109 and 8-147. The municipalities were also held to be entitled to substantial reimbursement from the State.
All of this has now changed because of the enactment of Medicaid. The underlying federal statute requires adoption of provisions on the state level providing aid for those receiving or eligible for categorical assistance. 42 U.S.C.A. § 1396a(a) (10) (A). Federal reimbursements depend upon conformance of state law to federal requirements. In 1968 New Jersey adopted its Medicaid statute, providing eligibility for those required by the federal law. N.J.S.A. 30:4D-3(f). The federal law went on, however, to permit, but not require, states to make federally subsidized Medicaid available to the medically indigent. 42 U.S.C.A. § 1396a(a) (10)(C). They may briefly be described as those ineligible for other forms of public assistance but lacking ability to meet the costs of necessary medical care.
Other states, including New York and Pennsylvania, opted to make the medically indigent eligible for Medicaid. New Jersey did not. The New Jersey Legislature, given the opportunity to include the medically indigent, declined to do so and, therefore, declined to receive the substantial federal aid available for states that chose to receive it. That decision was a legislative one, not reviewable here, and it is not intended to praise or condemn it. The point is that the Health Facilities Planning Act can accurately be read only against that decision.
*566 The hospitals argue that although not mandatory before, the statutes authorizing county payments for free needy care were rendered mandatory by the language of N.J.S.A. 26:2H-18(b);
Payment by government agencies for health care services provided by a health care facility shall be at rates established by the commissioner * * *.
Medicaid aside, if that were so, the failure to change the language of N.J.S.A. 44:5-11 et seq. would be hard to understand. It is even harder to see why the municipalities governed by N.J.S.A. 44:5-2 et seq. would not be equally affected by the "Payment * * * shall be" language. And, if they were, then a hospital could demand from both city and county the statutorily required payment for the same patient. That is not sensible. So, simply on the level of the use of language, it cannot be so. But, despite infelicitous language, argue the hospitals, the Legislature intends to make the counties pay for care for the medically indigent.
Considering Medicaid, the intent ascribed to the Legislature by the hospitals is outlandish. If they are correct, the Legislature intended to impose on the counties the burden of free care in a manner pointlessly guaranteeing blockage of available federal aid. If the Legislature meant the Health Facilities Planning Act to oblige the taxpayers to furnish inpatient hospital care to the medically indigent, it would certainly have wanted to do that in a manner insuring that the Federal Government would pay the bulk of the cost. It did not do so. The failure to include the medically indigent in Medicaid in 1968 shows that the Legislature did not believe the counties were then duty-bound by Title 44 to provide them care. The failure in 1971 to amend Title 30's Medicaid provisions to include them shows that the Legislature did not mean to create a new burden in Title 26 that could so easily have been federally subsidized.
Perhaps the availability of federal aid should not always be a factor guiding statutory construction. But, in this *567 kind of case it is so central and overarching a consideration to governmental program planners that it is impossible to ignore. Cf. Gesner v. Roberts, 48 N.J. 379 (1967).
What about the statutory language, "Payment * * * shall be at rates established by the commissioner?" Can it be harmonized with the optional nature of county appropriations for needy care or is it irreconcilably out of tune? The harmonizing method is a simple one. It is not to ignore the plain meaning of the word "may," as was done in Formal Opinion No. 9-1976. Rather, it is to see that "payment" has to do only with mandatory recompense for services. It has nothing to do with voluntary donations by governmental units, and certainly not donations which need not be made on a per-patient per-day basis at all. Cf. N.J.S.A. 44:8-147.
For all of these reasons, the county appropriation provisions of N.J.S.A. 44:5-11 et seq. remain optional and remain unaffected by the passage of N.J.S.A. 26:2H-18(b). The county may make such appropriation in such amounts as it deems reasonable. What of the hospitals' duty to treat patients who are unable to pay for care themselves? Without all the concerned parties in court, this is not the proper time to consider whether the hospitals have some common-law duty to provide care. See, e.g., Wilmington Gen'l Hosp. v. Manlove, 4 Storey 15, 54 Del. 15, 174 A.2d 135 (Sup. Ct. 1961); McDonald v. Massachusetts Gen'l Hosp., 120 Mass. 432 (Sup. Jud. Ct. 1876).
Similarly, it is not the proper time to rule whether a regulation can validly force a hospital to provide free care to the needy without reimbursement or, in fact, whether the peculiar language "shall be expected to" was intended to create such a duty.
If hospitals must provide such care and the Constitution mandates reimbursement, it is not necessarily the county that must provide it. On the other hand, perhaps the present state of the law in New Jersey obliges no one to care for the medically indigent. The questions raised by both possibilities ought to be laid to rest, and soon  and, hopefully, in the *568 context of legislative deliberation rather than sword's-point litigation.
The hospitals' motion is denied. Summary judgment is granted the county, which will submit an order. No costs. Since the basis upon which the decision was reached affects every phase of this matter, the parties may consent that an order for final judgment in the county's favor be entered without the need for further proceedings.
NOTES
[1] The problems potentially arising of cancellation by one hospital but not another were not explored.
[2] The agreement recites N.J.S.A. 44:5-16A, which speaks of county payments to hospitals providing free care for the poor in amounts keyed to hospital operating deficits. The agreement does not base payments on deficits but rather on the apportioned burden of free care costs. It does not mention N.J.S.A. 44:5-16 B, which authorizes county reimbursement on a per-patient per-day basis for hospital care of those who the freeholders are satisfied are poor. That is like the mechanism actually employed in the 1968 agreement, except that the hospitals are not paid for a day's care; rather, a gross sum is apportioned among them according to the amount of free care provided.
[3] Middlesex General Hosp. v. Commissioner of Health (Law Division, Mercer County, L-25706-73).
[4] The other prayer for relief was for a declaration that N.J.A.C. 8:43(B)-1.11(i) was an unconstitutional taking of private property without just compensation or due process. The Appellate Division said the matter was mooted and, in any event, was not ripe for decision.
[5] A-4010-74, decided June 24, 1976. It is important to note that the Appellate Division did not purport to decide what patients the county was liable to pay for.
[6] The 1976 appropriation was $715,000. The allowable ceiling under N.J.S.A. 44:5-16 was $7.3 million for that year. Under N.J.S.A. 44:5-11 it was $1.5 million. It is not perfectly clear whether the two limits are alternative or are to be aggregated. §§ 16A and B are clearly expressed to provide alternate methods of aid.
[7] It seems likely, for example, that urban hospitals that provide the bulk of free needy care are themselves more than usually dependent on the fixed returns afforded by Medicare, Medicaid and Blue Cross. Only the less burdened suburban hospital may have available to it the cushion provided by more flexible rate payments from other sources.
[8] See L. 1971, c. 459.