SAINT BARNABAS MEDICAL CENTER, PLAINTIFF–RESPONDENT, v. COUNTY OF ESSEX, DEFENDANT, AND JESSIE WILLIAMS, DEFENDANT-APPELLANT.

Argued December 1, 1987—Decided June 29, 1988.

Pollock, J., concurred and filed opinion.

H. *Curtis Meanor*, Acting Essex County Counsel, argued the cause for appellant (*H. Curtis Meanor*, attorney; *Thomas M. Bachman*, Asst. County Counsel, of counsel and on the briefs).

*Barry H. Ostrowsky* argued the cause for respondent (*Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone*, attorneys; *Barry H. Ostrowsky* and *Todd C. Brower*, on the brief).

The opinion of the Court was delivered by

STEIN, J.

The novel question for decision in this case is the extent to which a county is responsible for the hospitalization costs of an indigent county jail inmate where the inmate remains hospitalized past the termination of his sentence. The Appellate Division held that an implied contract existed between the parties obligating defendant Essex County to pay to plaintiff, Saint Barnabas Medical Center (Saint Barnabas), the full amount owing for the inmate's hospitalization, here nearly $54,000, provided Saint Barnabas could prove that the entire duration of the patient's stay was necessary. We reverse. We find that no contract was formed, and hold that in the absence of a valid contractual arrangement the County is responsible only for the hospitalization costs incurred during the tenure of the inmate's sentence. The loss resulting from the unpaid portion of the bill is to be borne by Saint Barnabas, where, through administrative rate-setting procedures, and beginning in 1987 through the mechanism of the Uncompensated Care Trust Fund, it is spread out among all "payers" for hospital services.

I

On July 13, 1982, Jessie Williams was committed to the Essex County Jail Annex, located in Caldwell, to begin serving a fifteen-day sentence. On July 16, Williams set himself on fire and required emergency treatment. Although Essex County had an existing arrangement with University Hospital for the

treatment of its prisoners, corrections officers transported Williams to Saint Barnabas because of its specialized burn unit. The officers apparently told the hospital staff that they had brought Williams from the Essex County Jail, and gave them a phone number to call for information. However, there is no evidence of any discussion concerning responsibility for his medical bills.

Three days later, on July 19, 1982, Ray Grimm of Saint Barnabas phoned Elizabeth Neff in the Jail Annex's business office to confirm Williams' status as an inmate and to ascertain whether the County would be responsible for the treatment costs. Earlier that day, on the County's motion, the remaining eight days of Williams' sentence had been vacated by the Newark Municipal Court, R. 3:21-10(a), (b)(2). Accordingly, Neff informed Grimm that Williams was being "released," but acknowledged that the County would pay for the hospitalization costs incurred thus far, from Williams' admission to the hospital on the sixteenth through the end of the day. Her statements were based on the jail's customary method of handling such cases with University Hospital, with which the County had a contract for treating its prisoners when necessary, whereby the County would pay the hospital for the number of days the hospitalized inmate was still in the County's custody. In a letter to Grimm dated July 23, 1982, Neff confirmed her statement that the County would pay for Williams' medical care only through the nineteenth.

On August 10, 1982, Grimm responded by letter, informing Neff that Saint Barnabas considered the County "responsible for the total cost of the care for Mr. Williams." After roughly seven weeks of treatment, Williams was released from the hospital on September 2, 1982; the total cost of his treatment and hospitalization came to $53,725.59, and an invoice in that amount was forwarded to the County. Consistent with its stated position, the County refused to acknowledge liability except for the first four days of Williams' treatment, an amount stipulated to be $5,401.

Saint Barnabas commenced this action against Williams and Essex County for the total cost of treatment. Williams was never served, and the case against him was subsequently dismissed without prejudice.[1]

In January 1986, cross motions for summary judgment were argued before the Law Division, and in a published opinion, the court granted plaintiff's motion, ruling that the County was liable for the full term of Williams' stay in the hospital. *Saint Barnabas Medical Center v. Essex County*, 211 *N.J.Super.* 488 (1986). The court found an implied agreement to pay, reasoning that "the hospital had a right to rely on the credit of the County." *Id.* at 493. The court also found that the County had a duty to obtain medical treatment for Williams, pursuant to applicable administrative regulations. It rejected the County's claim that its responsibility for treatment ended when Williams' sentence was vacated, ruling that the County was estopped from altering the terms of its implied agreement with the hospital. *Id.* at 494–96. The court did not, however, expressly assign any basis for the County's liability for the five-week period between the date Williams' sentence was originally scheduled to end, July 27, 1982, and his discharge from the hospital on September 2, 1982.

The Appellate Division recognized this gap in the trial court's ruling, noting in its opinion of March 23, 1987, that "even if the County had not obtained the order suspending Williams' sentence, his [jail] term would have expired before he was discharged from the hospital." 216 *N.J.Super.* 161, 164. The Appellate Division agreed that "an implied contract had been formed," citing *Shapiro v. Solomon*, 42 *N.J.Super.* 377, 383

---

[1]At no time has plaintiff contended that the events surrounding Williams' injuries could give rise to tort liability on the County's behalf. We note that Williams apparently did institute a tort claim against the County at some point, *see Saint Barnabas Medical Center v. Essex County*, 211 *N.J.Super.* 488, 491 (Law Div.1986), but those proceedings are not part of the record in this case. We assume for purposes of this decision that defendant is not liable in tort. *See infra* at 81–82 & n. 3.

(App.Div.1956), for the proposition that "the rendition of services at the request of another, under circumstances which negative the idea that they were gratuitous, creates an obligation implied from the request to pay what the services are reasonably worth." *Id.* at 164–65. This reasoning, said the court, was "clearly applicable" to the period after July 27 as well, observing that the fact that Williams' right to medical care at the County's expense ended with the termination of his sentence was "not germane." *Id.* at 165.

Although the Appellate Division ruled that the County's implied contractual obligation was sufficient to impose liability on it for the entire term of Williams' care, it remanded the case to the Law Division, in the interests of "fundamental fairness," and ordered that plaintiff prove it could not have lawfully discharged or transferred Williams prior to his actual release on September 2, 1982. *Id.* at 165–66. The Appellate Division's view was that the County's implied obligation to pay should go no further than the point at which Saint Barnabas could have effected a lawful termination of Williams' hospitalization.

We granted the County's petition for certification. 108 *N.J.* 186. St. Barnabas filed no cross petition from the Appellate Division's modification of the trial court ruling.

## II

### A.

The basic issue in this case can be stated simply: As between a county and a hospital, which entity should bear the cost associated with the medical treatment of an indigent initially requiring such treatment while a ward of the county? Its resolution derives partially from principles of contract law, but is based primarily on the legal duties imposed on counties, with respect to the health care of indigent county jail inmates, and on hospitals, with respect to the health care of indigents generally.

■ As a matter of both state and federal law, defendant Essex County had an absolute duty to see that Williams received medical treatment for his injuries. Pursuant to regulations promulgated by the Commissioner of Corrections, *see* *N.J.S.A.* 30:1B–10, county prisoners, while confined, are classified as "wards of the county" with the "right to * * * proper medical care." *N.J.A.C.* 10:34–3.1(a), –3.2(5) (current version at *N.J.A.C.* 10A:31–3.15(a)). Counties must establish in-house medical facilities for their jails, but prison physicians are authorized to recommend that seriously ill inmates be transferred to a "civilian hospital." *N.J.A.C.* 10:34–3.5, –3.7(a)(6) (current versions at *N.J.A.C.* 10A:31–3.15(b), (b)(16), (b)(17)). These regulations implement the State's federal constitutional duty "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 *U.S.* 97, 103, 97 *S.Ct.* 285, 290, 50 *L.Ed.*2d 251, 259 (1976) (eighth amendment proscribes "deliberate indifference to serious medical needs of prisoners"); *see also Revere v. Massachusetts Gen. Hosp.*, 463 *U.S.* 239, 103 *S.Ct.* 2979, 77 *L.Ed.*2d 605 (1983) (fourteenth amendment due process clause mandates that injured pretrial detainees receive necessary medical care). Thus, having determined that Williams could not receive adequate care in the jail's own facilities, county corrections officials had a duty to obtain proper treatment elsewhere.

■ New Jersey counties are not, however, legally obligated to help finance the costs of providing medical care to indigent county citizens. *Perth Amboy Gen. Hosp. v. Board of Chosen Freeholders, Middlesex County*, 158 *N.J.Super.* 556, 563–67 (Law Div.1978). Nor is there any statute expressly "requiring a county to pay for the medical treatment of county jail inmates received in civilian hospitals." *Cooper Medical Center v. Johnson*, 204 *N.J.Super.* 79, 84 (Law Div.1985), *aff'd o.b.*, 208 *N.J.Super.* 38 (App.Div.1986). With respect to county residents in general, the Legislature has authorized, but not required, counties to contribute in various ways to the costs incurred by hospitals in providing unreimbursed health care. *See N.J.S.A.*

44:5–11 to –19 [2]; *Perth Amboy Gen. Hosp., supra,* 158 *N.J.Super.* at 563 (statutes give counties "the right but not the duty to appropriate and apportion public funds"). And as far as funding the treatment of county prisoners is concerned, purely a state law question, *Revere, supra,* 463 *U.S.* at 245, 103 *S.Ct.* at 2983, 77 *L.Ed.*2d at 611 (state law governs issue of who pays for prisoner's or detainee's medical care), the regulations discussed above make no provision for payments of any sort when an inmate is transferred to a civilian hospital. *N.J.A.C.* 10:34–3.7 (current version at *N.J.A.C.* 10A:31–3.15(b)).

■ Consistent with defendant's obligation to obtain care for Williams, plaintiff, Saint Barnabas, was bound by state law to accept and treat him. Pursuant to rule-making authority granted by the Legislature, *N.J.S.A.* 26:2H–5, the Department of Health has promulgated regulations requiring all hospitals, as a condition of licensure, to treat indigent patients needing care. Moreover, the Administrative Code mandates that "all hospitals shall provide accident and emergency services and shall accept, when medically indicated, patients seeking such services without regard to their ability to pay." *N.J.A.C.* 8:43B–1.11(q)(7); *see also N.J.A.C.* 8:43B–1.11(i) ("all hospitals shall be expected to provide care for the needy sick * * *."). Indeed, in legislation enacted subsequent to the events at issue in this case, the Legislature has prescribed, *inter alia,* that "access to quality health care shall not be denied to residents of the State because

---

[2]*N.J.S.A.* 44:5–11 (counties without county-supported hospital "may" appropriate up to $800,000 per year to support treatment for residents); *N.J.S.A.* 44:5–14 (counties without county-supported hospital "may" appropriate any amount desired to construct or enlarge hospital(s) supported by "private charity"); *N.J.S.A.* 44:5–16A (counties smaller than 850,000 "may" appropriate one-tenth of one percent of total assessed value of real and personal property to fund local charitable hospital(s) where resident indigents and/or poor are treated up to an amount equal to the hospital(s)' annual deficit); *N.J.S.A.* 44:5–17 (counties larger than 850,000 "may make provision for the support of resident indigent patients" under certain conditions, if the need for such treatment is certified to in each case by county physician and hospital officials, and the governing body approves the expenditure).

of their inability to pay for the care * * *." *L.*1986, *c.* 204, § 1 (Jan. 5, 1987).

Furthermore, the Legislature has demonstrated its awareness of the costs involved in fulfilling this obligation, and has taken steps to alleviate the resulting financial burdens imposed on hospitals. In 1978 the Legislature established a comprehensive scheme of rate regulation for this state's hospitals, and directed the newly-established Hospital Rate–Setting Commission, in establishing payer reimbursement rates, to consider the costs involved in providing health care to indigent patients. *See N.J.S.A.* 26:2(h)–4.1, –18(d); *see also N.J.A.C.* 8:31B–3.41 (regulations implementing statutory directive); *N.J.A.C.* 8:31B–4.38 to –4.40 (same). *See generally Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n,* 98 *N.J.* 458, 461–64 (1985) (explaining rate-setting process). As the Court noted in *In re Barnert Memorial Hosp. Rates,* 92 *N.J.* 31, 36 (1983), a fundamental aspect of the 1978 legislation was its attempt "to alleviate the single most pressing problem facing urban hospitals by requiring the cost of unreimbursed indigent care to be considered in the state-controlled hospital rate and charged to all payors." Most recently, in 1987, the Legislature established the "Uncompensated Care Trust Fund," which, through the equitable collection and distribution of monies generated by increasing the rates charged to payers at all New Jersey hospitals, seeks to spread the costs of indigent health care across the state. *See L.*1986, *c.* 204; *see also N.J.A.C.* 8:31B–7.1 to –7.8 (implementing regulations).

## B.

Against this background of legal obligations, it is not difficult to understand the failure of the parties' agents to negotiate a contract for Williams' medical treatment at the emergency room door. In dealing with the impending medical emergency, the corrections officials and hospital staff acted pursuant to mandatory legal duties and did not purport to negotiate a

binding agreement. We find that a contract was neither formed nor contemplated.

■ Nor did the parties' conduct give rise to an implied contractual arrangement. A true contract implied in fact "is in legal effect an express contract," and varies from the latter only insofar as the parties' agreement and assent thereto have been manifested by conduct instead of words. *Saint Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co. of N. America,* 32 *N.J.* 17, 23 (1960); *accord Restatement (Second) of Contracts* § 4 comment a. Like express contracts, contracts implied in fact depend on "mutual agreement and intent to promise," *West Caldwell v. Caldwell,* 26 *N.J.* 9, 29 (1958) (quoting *Williston on Contracts* § 3 (Jaeger 3rd ed. 1981)), and can be established by objective proofs. *Saint Paul, supra,* 32 *N.J.* at 24 (inquiry is significance of parties' actions as viewed by reasonable person engaged in relevant custom or trade). Saint Barnabas, however, has pointed to no evidence of conduct by its or the County's agents manifesting either of these elements.

■ Even if the actions of plaintiff's agents are assumed to have manifested an objectively reasonable intent and expectation of receiving ordinary, complete compensation, Saint Barnabas could not, under the circumstances of this case, have reasonably inferred from the conduct of the County's agents an intent to pay for the services "requested." Defendant Essex County is subject to the strictures of the Local Public Contracts Law, *N.J.S.A.* 40A:11-1 to -40, which seeks to protect public funds by ensuring that money is spent in an efficient manner, by those properly authorized to spend it. *See Slurzberg v. Bayonne,* 29 *N.J.* 106, 114-15 (1959) (public contracting laws further the "interest of efficient and economical local administration of government" through avoidance of "waste, extravagance and ill-considered spending"). Accordingly, the law presumes that public contractors operate with knowledge of relevant laws constraining the procedural and substantive discretion and authority of officials with whom they deal, *see State v.*

*Erie R.R. Co.*, 23 *N.J.Misc.* 203, 212, 42 *A.*2d 759 (Sup.Ct.1945), and where applicable provisions are not followed, any agreements entered into are unenforceable, absent lawful ratification. *See Hudson City Contracting Co. v. Jersey City Incinerater Auth.*, 17 *N.J.* 297, 305 (1955); *Scatuorchio v. Jersey City Incinerator Auth.*, 14 *N.J.* 72, 85–93 (1953); *Bauer v. City of Newark*, 7 *N.J.* 426, 432–34 (1951); *City of Jersey City v. Roosevelt Stadium*, 210 *N.J.Super.* 315, 327–29 (App.Div.1986); 10 E. McQuillan, *Municipal Corporations* § 29.26 at 294–95 (3rd ed. 1981 rev.) (hereinafter *E. McQuillan* ).

Here, the appropriate procedures were not complied with, *see* *N.J.S.A.* 40A:11–6 (emergency purchases and contracts), and plaintiff makes no assertion to the contrary. Defendant County's agents were without authority to contract on the County's behalf for Williams' treatment. Thus, even an express promise to pay for Williams' treatment would have been unenforceable. *E.g., Scatuorchio, supra*, 14 *N.J.* at 93. And inasmuch as the officials lacked authority to contract expressly for plaintiff's services, their "request" for those services cannot give rise to a contract implied in fact. *See Bauer, supra*, 7 *N.J.* at 434–35; *Cooper Medical Center, supra*, 204 *N.J.Super.* at 82; 10 *E. McQuillan, supra*, § 29.112 at 516 (if statute requires contracts to be made in certain way and impliedly forbids other methods, no contract can be implied if provisions have not been complied with); *id.*, § 29.26 at 295) (where process was defective there can be no recovery against public entity in implied contract even if benefits have been received).

In *Cooper Medical Center v. Johnson, supra*, Pennsauken Township police took an injured arrestee to plaintiff hospital for treatment, and as here no arrangements for payment were made. The court rejected the hospital's contention that a contract implied in fact obligated the Township to pay for the arrestee's treatment, reasoning that the police were without authority to contract for such services, and that "the procedures for the formation of a valid contract were not followed." 204 *N.J.Super.* at 82 (citing *N.J.S.A.* 40A:11–3, –5, –6). The

court found it "well settled that a municipal corporation cannot be bound in contract, express or implied, unless the officer or employee has authority to enter into such a contract on behalf of the corporation." *Id.* (citing *Giardini v. Town of Dover*, 101 *N.J.L.* 444, 446 (Sup.Ct.1925); *Potter v. Metuchen*, 108 *N.J.L.* 447, 451 (Sup.Ct.1931)).

 In terms of implied-in-fact contract doctrine, the unstated rationale for such a result is that where a public official requests services but lacks substantive or procedural authority to contract expressly for them, the provider of those services cannot reasonably infer an intent to pay for them. Thus, the Appellate Division erred in finding an implied contract in this case since the circumstances did not sufficiently "negative the idea that [the services] were gratuitous." 216 *N.J.Super.* at 165 (quoting *Shapiro, supra,* 42 *N.J.Super.* at 383). We hold that no liability to pay for Williams' care in part or in full can be imposed on defendant County based on a contract implied in fact.

### C.

 However, Saint Barnabas need not shoulder the entire burden of providing the indigent inmate with medical treatment. Because Saint Barnabas fulfilled the County's duty to provide or obtain treatment for Williams during the tenure of his sentence, the County has been enriched at plaintiff's expense. To the extent the County benefited from plaintiff's discharge of its duty, recovery may be had based on *quasi*-contract, or a contract implied-in-law.

As explained by the Court in *Saint Paul Fire & Marine Ins. Co., supra,* a *quasi*-contractual obligation is wholly unlike an express or implied-in-fact contract in that it is "imposed by the law for the purpose of bringing about justice without reference to the intention of the parties." 32 *N.J.* at 22; *accord West Caldwell v. Caldwell, supra,* 26 *N.J.* at 28–29; *Restatement (Second) Contracts* § 4 comment b. In the case of actual

contracts the agreement defines the duty, while in the case of *quasi* contract the duty defines the contract." *Insulation Contracting & Supply v. Kravco, Inc.,* 209 *N.J.Super.* 367, 376 (App.Div.1986) (citing *Callano v. Oakwood Park Homes Corp.,* 91 *N.J.Super.* 105, 108 (App.Div.1966)). The scope of the relevant duty is a question of law to be decided by the court, in this case to be inferred from the public policies implicit in the statutes and regulations discussed above, *supra* at 73–75. *Cf. A.L. v. P.A.,* 213 *N.J.Super.* 391, 398 (App.Div.1986) (denying recovery in *quantum meruit* based on public policies underlying relevant statutes), *certif. denied,* 107 *N.J.* 110 (1987); *Restatement of Restitution* § 113 comment b (where *quasi*-contractual obligation is imposed on public entity to pay for services rendered a third person fulfilling entity's noncontractual duty, scope of obligation turns on interpretation of relevant statutes). Since the procurement of medical services for inmates is within the scope of a county's contracting powers, the application of *quasi*-contract principles is not barred by defendant's mere failure to follow proper contracting procedures. *See Hudson City Contracting Co., supra,* 17 *N.J.* at 308–09 (if power to contract for services rendered "lies within the competence of the municipal corporation," recovery on theory of *quantum meruit* permissible despite failure to follow proper procedure); 10 *E. McQuillin, supra,* § 29.110 at 506 (municipal corporation may be held liable in *quasi*-contract).

The regulations governing the administration of county correctional facilities clearly imposed the responsibility for an inmate's health care on the county, but only during the period of incarceration. According to these regulations, "medical services include all measures needed to keep the inmate population in good health," and "[w]hile confined in such institutions, prisoners are wards of the counties." *N.J.A.C.* 10:34–3.1 (repealed). Depending on the size of the facility, *N.J.A.C.* 10:34–3.5 (repealed) required the establishment of either an on-premises hospital or infirmary. Today, *N.J.A.C.* 10A:31–3.15(a) mandates that:

During the period of confinement, the inmate is a ward of the county and concern shall be shown for both his physical and mental well-being. While it would be unrealistic to burden the county jail with responsibility for all the inmates' health needs, essential medical, dental, and health service care shall be provided.

These regulations embody a custodial—noncustodial distinction for purposes of health-care obligations. The county is the appropriate entity to cover the costs of providing custodial health care. Nothing, however, indicates that counties are to be treated as insurers for the future medical needs of indigent inmates any time a condition necessitating treatment arises during the period of confinement. *Cf. Commonwealth v. Lyles*, 77 *Pa.Commw.* 15, 464 *A*.2d 712, 714 (1983) ("correctional system is not a medical provider and should not be considered solely liable for the expense of treatment of every person who at some point is placed in the system"). The implausibility of imposing insurer-like duties on a county is evinced by positing the case of an indigent prisoner who, during the pendency of a county jail term, discovers he has cancer or AIDS, requiring extensive medical treatment for the rest of his life. In the absence of a tortious relationship between the county's incarceration of the inmate and the medical condition necessitating treatment, the existing legislative allocation of fiscal health care obligations compels the conclusion that county taxpayers are not the appropriate source of funding for such treatment. *Cf. Perth Amboy Gen. Hosp. v. Board of Chosen Freeholders, Middlesex County, supra*, 158 *N.J.Super.* at 563 (though it might be sensible to impose indigent health care costs on county taxpayers, "the law is otherwise").[3] The coun-

---

[3]Conversely, when inmates' injuries *are* the result of actionable negligent conduct by county officials or employees, fundamental tort law principles dictate that county taxpayers are precisely the appropriate group to pay for the necessary medical treatment. Through their management and oversight of county correctional facilities, county officials are in the best position to take precautions against negligently inflicted injuries to inmates. Further, counsel has informed us that typically counties are insured against the costs of tort

ty's fiscal responsibility for the medical treatment of its inmates ends with the inmates' sentence. That responsibility is unaffected by the fact that in this case the necessary treatment could not be provided by the jail's in-house medical facilities. We hold that where the county and hospital have not entered into a lawful, express contract for an indigent inmate's treatment, a *quasi*-contract, or contract implied-in-law, obligates the county to reimburse the hospital for the treatment costs incurred during the remainder of the prisoner's sentence.

From Saint Barnabas's perspective, it is entirely within the ambit of its legal and fiscal responsibilities to accept the costs associated with indigent health care. The Legislature has imposed the initial costs of such care on hospitals but has mandated that it be passed along to all purchasers of health care. As noted, prior to 1987 all New Jersey hospitals were permitted to "mark up" their rates prospectively based on the estimated amount of care to be provided indigents or patients otherwise unable to pay. *N.J.S.A.* 26:2H–18(d); *N.J.A.C.* 8:31B–3.41, –4.38 to 4.40; *see Cooper Medical Center v. City of Camden,* 214 *N.J.Super.* 493, 497 (App.Div.1987) (hospitals are compensated for providing indigent health care by the incorporation of an uncompensated care factor into their rates). However, this hospital-specific method of distributing the costs of indigent health care impeded effective competition by forcing some hospitals, typically those serving inner city areas, to raise their rates much more than others. To remedy the situation, the Legislature established the Uncompensated Care Trust Fund and directed the computation of a uniform statewide "uncompensated care add-on" to be used in rate-setting at all hospitals. *L.*1986, *c.* 204, § 6; *N.J.A.C.* 8:31B–7.3. Hospitals that collect more through the add-on than necessary to cover their uncompensated care costs then "remit the net difference to the Fund," while hospitals whose indigent health care costs

---

actions by prisoners, in which medical expenses would normally be recoverable.

exceed the amount collected are authorized "to receive the net difference from the Fund." *L.*1986, *c.* 204, § 7(b). Section 1 of the Act sums up the thrust of the legislation as follows:

The Legislature finds and declares that: access to quality health care shall not be denied to residents of the State because of their inability to pay for the care; there are many residents of the State who cannot pay for needed hospital care and in order to insure that these persons have equal access to hospital care it is necessary to establish a mechanism which will ensure payment of uncompensated hospital care; to protect the fiscal solvency of the state's general hospitals as provided for in [*N.J.S.A.* 26:2H-1 *et seq.*], it is necessary that all payers of health care services share in payment of uncompensated care on a Statewide basis; and, therefore, it is necessary to establish the "New Jersey Uncompensated Care Trust Fund." [*L.*1986, *c.* 204, § 1.] [4]

The Legislature has thus clearly established as the public policy of this State a system that imposes the costs of indigent medical care not on county taxpayers but on "all payers of health care services." Accordingly, we hold that the cost of the inmate's health care subsequent to the expiration of his sentence cannot be passed on to Essex County, but is to be borne by Saint Barnabas subject to its right to spread the loss through appropriate statutory and regulatory mechanisms. We recognize that this allocation of responsibility between a county and a private hospital does not follow inevitably from existing statutory or regulatory commands. It is significant, however, that in these cases the duration of the care may bear no relationship to the duration of the custodial term. We are convinced that our resolution of this issue is one that is both pragmatic and fully consistent with the public policies underlying the pertinent statutes and regulations.

Although Essex County concedes responsibility for the costs of hospital care until June 19, 1982, when Williams' sentence was vacated, it argues that it should not be liable for the remaining days Williams was scheduled to serve. Counsel

---

[4]Additionally, the Legislature established a nineteen-member Uncompensated Care Trust Fund Advisory Committee to aid the Department of Health in implementing the legislation, *L.*1986, *c.* 204, § 5, and appropriated a fifteen-million dollar loan to the Fund. *Id.* §§ 12, 14.

suggests that it is routine practice to vacate the sentence of a hospitalized county jail inmate, and represented at argument that in this case it was done to relieve the County of the three-thousand dollar per week expense of providing twenty-four hour armed guards at the hospital. We do not question the County's authority to move the municipal court to vacate the remainder of Williams' sentence. *See R.* 3:21–10(b)(2); *N.J.A.C.* 10:34–3.7(a)(7) (repealed). While we cannot fault the County for attempting to avoid the expense of guarding Williams while he was a patient at Saint Barnabas, we do not equate its authority to avoid that cost with the power unilaterally to alter the allocation of responsibility between it and Saint Barnabas for the cost of Williams' hospital care. The County's legal duty was to provide for Williams' health care while he was a prisoner; it should not be permitted to avoid that duty at Saint Barnabas's expense by prematurely terminating his prison term. Hence, we reject the County's argument that its financial responsibility terminated when Williams' sentence was vacated, and hold that it must pay for the number of days Williams would have served had he not injured himself. Counties remain free to seek the vacation of prisoners' sentences in such cases, but it will not affect their *quasi* contractual liability to the hospital if the inmate is indigent.

### III

Essex County is liable in *quasi*-contract to Saint Barnabas for the expenses incurred in treating Williams during the period Williams would have been under sentence. On remand, unless the parties can stipulate to these matters, the Law Division should ascertain when Williams would have been released from the jail annex had he not been injured, and determine how much of the $54,000 total is attributable to that period. Accordingly, we affirm in part and reverse in part the judgment of the Appellate Division.

POLLOCK, J., concurring.

On July 13, 1982, the Newark Municipal Court sentenced the defendant Williams to a fifteen-day term at the Essex County Jail. Three days later, he set himself on fire. Nothing in the record establishes that negligence of the County contributed to that event. Although the County had contracted with the University of Medicine and Dentistry to provide hospital care for prisoners, the prisoner's burns were sufficiently severe for the County to take him to Saint Barnabas Medical Center, which maintains a burn unit. Three days after he was admitted to Saint Barnabas, the Municipal Court vacated the balance of the sentence at the County's request. The prisoner remained at Saint Barnabas until September 2, 1982, incurring a hospital bill of $53,757.59, which he cannot pay because he is indigent. The issue is the allocation of the bill between the County and the hospital in the absence of a contract between them.

The Court concludes that Essex County is responsible for the medical care of the prisoner for a period of time co-extensive with the prisoner's original sentence, and that St. Barnabas is responsible for the balance of the prisoner's medical care. In reaching that result, the Court relies on the doctrine of quasi-contract or unjust enrichment and, in the absence of an express or implied contract, creates a contract between the parties. It is as if the parties had agreed that Essex County would pay for the prisoner's care during the term of his original sentence and that St. Barnabas had agreed to be responsible thereafter. The Court considers the costs of the prisoner's medical care and the consequences of the allocation of those costs. I concur. Courts should be aware of the costs and consequences of their decisions.

Implicit in the Court's opinion is recognition that the County is better able to control the risk of loss resulting from injuries to prisoners while they are in the County Jail. As between the County and St. Barnabas, the County, which maintains the jail, is better able to prevent prisoners from setting themselves on

fire. Furthermore, the Court considers whether the County or the hospital is better able to allocate the cost of that risk. The parties did not present facts on the economic aspects of the distribution of the risk of loss or of the cost of that risk. Nonetheless, the statutory scheme, L.1986, c. 204, § 6; N.J.A. C. 8:31B–7.3, makes clear that a hospital must provide emergency treatment to an indigent patient and that the cost of that treatment is to be spread among the ratepayers of other hospitals throughout the State. Here, the effect would be to spread the cost among citizens, albeit those who are hospital patients, located throughout New Jersey, not simply those who reside in Essex County. Arguably, a legislative scheme would be more equitable and efficient if it distributed the cost of treating indigent patients among all citizens of the State, not merely those who become hospitalized. *Monmouth Medical Center v. State*, 80 *N.J.* 299, 312 (1979); Star-Ledger, June 26, 1988, § 3, at 8, col 1. We are constrained, however, to accept the scheme as provided by the Legislature. In this context, the court sensibly concludes that the County should bear the cost of treatment during the period of the prisoner's original sentence and that the hospital should thereafter be responsible. Both entities can spread the risk of loss: the County by transmitting the risk to the taxpayers, and the hospital by transmitting the risk to other ratepayers.

To the extent that the Court considers the distribution of the risk of loss, its decision is consistent with other opinions of this Court. *See, e.g., Spring Motors Distribs., Inc. v. Ford Motor Co.*, 98 *N.J.* 555, 567–68 (1985); *Kelly v. Gwinnell*, 96 *N.J.* 538, 550 n. 9 (1984); *O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 181–82 (1983); *Trentacost v. Brussel*, 82 *N.J.* 214, 226 (1980); *Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 173 (1979); *Monmouth Medical Center v. State, supra*, 80 *N.J.* at 312; *Cepeda v. Cumberland Eng'g Co., Inc.*, 76 *N.J.* 152, 174 (1978); *Property Owners Ass'n of N. Bergen v. Township of N. Bergen*, 74 *N.J.* 327, 337 (1977); *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 379 (1960). Likewise, the considera-

tion of the ability of a party to control the risk of loss is also a relevant consideration. *See, e.g., Spring Motors Distribs., Inc., supra,* 98 *N.J.* at 567–68; *O'Brien, supra,* 94 *N.J.* at 181–82; *Cepeda, supra,* 76 *N.J.* at 174; *Henningsen, supra,* 32 *N.J.* at 379. In sum, a consideration of economic consequences in arriving at an appropriate decision is consistent with our jurisprudence.

By relying on unjust enrichment, the court's decision "suggests a moral basis for law (perhaps) divorced from the economic." R. Posner, *Economic Analysis of Law* § 4.13 at 122 (3d ed. 1986). Judge Posner believes, however,

[i]n fact, the principal case outcomes are better explained in economic than moral terms. The concept of an implied contract is a useful shorthand for an economic approach, for that approach suggests that there is a considerable continuity between express contracts and the questions nowadays treated under the rubric of unjust enrichment. [*Ibid.*]

Thus, the Court's decision may be understood not only in terms of unjust enrichment but in terms of its economic consequences.

A court need not be committed to economic determinism to appreciate that an economic analysis can reveal and effectuate policy choices. *See* White, *Coase and the Courts: Economics for the Common Man,* 72 *Iowa L.Rev.* 577 (1987). As the Court acknowledges, its decision is not compelled by economic considerations but "is based primarily on the legal duties imposed on counties, with respect to the health care of indigent county jail inmates, and on hospitals with respect to the health care of indigents generally." *Ante* at 73. In effect, the Court invokes economic reasoning to disclose policy choices implicit in legislatively imposed legal duties. Rather than predicate the decision on an independent economic analysis, the Court defers to the legislative and regulatory judgment on policy choices. *See N.J.A.C.* 10A:31–3.15(a) ("[w]hile it would be unrealistic to burden the county jail with responsibility for all the inmates' health needs, essential medical, dental, and health service care shall be provided); *L.*1986, *c.* 204 (declaring that "access to quality health care shall not be denied to residents of the State because of their inability to pay for the

care"); *N.J.A.C.* 8:43B–1.11(q) (requiring that hospitals "shall provide accident and emergency services at all times and shall accept, when medically indicated, patients seeking such services without regard to their ability to pay"). Nonetheless, an economic analysis reveals the costs and subsidies implicit in the Court's decision.

This, I believe, is an appropriate use of economic analysis in the judicial process. Economics and law are different, but each discipline can illuminate the other. Economic analysis not only recognizes a decision's costs and benefits, but makes more predictable the effect of the decision. To appreciate that use of economic analysis, one need not subscribe to the proposition that the right rule of law is necessarily the one that is the most efficient. An economic analysis may be more appropriate in some cases, such as those involving rights that are traditionally measured by a monetary standard, than in others, such as those that involve fundamental or deeply personal rights. Some rights are not readily susceptible to an economic evaluation. *Compare Matter of Baby M,* 109 *N.J.* 396, 440 (1988) (in declaring unenforceable a contract for surrogate motherhood, the Court stated: "There are, in a civilized society, some things that money cannot buy") *with* R. Posner, *Economic Analysis of Law, supra,* § 5.4, at 139–43 (hypothesizing a free market in babies because "the costs of production to natural parents are much lower than the value that many childless people attach to children," and because "the parents who value a child the most are likely to give it the most care"). Deciding cases remains an exercise in judgment, and an economic analysis, although it sheds light on a just decision, need not predetermine the outcome of a case.

POLLOCK, J., concurs.

*For affirmance in part; reversal in part* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.