**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1050-24

SAKER ASSOCIATES
LIMITED and
BUILDING 45, LLC,

    Plaintiffs-Respondents,

v.

JANICO, INC.,

    Defendant-Appellant,

and

SAUL SIEGMAN,

    Defendant,

and

INDUSTRIAL COURTS, LLC,

    Third-Party Plaintiff/
    Appellant,

v.

SAKER ASSOCIATES
LIMITED and

BUILDING 45, LLC,

       Third-Party Defendants/
       Respondents.

_____

Argued March 24, 2026 – Decided April 9, 2026

Before Judges Gilson and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. DC-002771-24.

Jonathan L. Leitman argued the cause for appellants (Law Offices of Jan Meyer & Associates, PC, attorneys; Jonathan L. Leitman, on the briefs).

Vincent E. Halleran, Jr., argued the cause for respondents.

PER CURIAM

In this breach of contract case involving a dispute over the payment of common area expenses for a commercial real estate property, defendant Janico, Inc. (Janico) appeals from a November 7, 2024 trial order entering judgment in favor of plaintiffs/third-party defendants Saker Associates Limited and Building 45, LLC (Saker and/or Building 45, collectively "plaintiffs") awarding $14,238.21 plus costs following a bench trial. We affirm.

2

A-1050-24

I.

Factual Background

The facts and history of this case are drawn from the record. On July 28, 1988, plaintiffs entered into a developer's agreement with the Township of Howell (the Township). Plaintiffs obtained approval to build and subdivide a lot into five pieces of land, which includes 88 Industrial Way (the property) as part of a commercial complex. The developer's agreement made plaintiffs responsible to pay for certain common area expenses until the Township issued a final acceptance of the development. Plaintiffs were obligated to maintain the roadway within the complex until the roadway was given to the Township. However, to date a final acceptance has not happened.

Paragraph two of the developer's agreement provides plaintiffs "shall construct certain improvements shown on the preliminary and final maps and the records before the Howell Planning Board." Further, plaintiffs "shall install the site work improvements, including but not limited to streets, curbs, gutters, sidewalks, street signs, street lights, sanitary sewers, water mains[,] and property monuments, [] in accordance with the specifications and Ordinances of the Township." Paragraph seven of the developer's agreement stipulates plaintiffs

A-1050-24

are responsible for the common area expenses until the Township provides final acceptance.

Specifically, paragraph seven of the developer's agreement states:

> During the course of construction, and until the time of any final acceptance [plaintiffs] shall maintain and repair all roads within the subdivision. [Plaintiffs] shall provide and pay for all street lighting and water hydrant service which must be installed and maintained in the subdivision, and provide and pay for all snow plowing until the time of any final acceptance.

Further, paragraph seven defines final acceptance as:

> [T]he date upon which any sidewalks, curbing, streets, and street lighting are accepted by the Township and the final maintenance guarantees for the same are posted with the township. . . . It is further agreed that in the event the [d]eveloper fails to pay for fees for street lighting, water, hydrant service, or fails to provide required snow plowing, then, in that event, and subsequent to ten (10) days written notice by the Township to the [d]eveloper, the Township may withdraw from the cash portion of the performance guarantee such service, and to continue to make such payments as necessary from said funds in order to insure continued water, utility, and snow plowing services.

Plaintiffs sold the five subdivided lots and delegated the responsibility to pay the common area expenses by billing the occupants[1] for their proportionate

---

[1] We use the terms "occupants" and "tenants" interchangeably in our opinion.

share of the services performed. In that regard, plaintiffs would calculate the total amount due for the common area expenses and invoice the occupants based on the amount of land they owned or occupied. Plaintiffs invoiced the occupants on a "handshake" agreement that was never memorialized in writing.

At some point, plaintiffs sold the property to 88 Vanderveer Road, LLC (Vanderveer Road), which is not a party to this litigation. On October 23, 2015, Vanderveer Road sold the property to third-party plaintiff Industrial Courts, LLC (Industrial Courts) for $2,650,000. Industrial Courts still owns the property but rents it to Janico. Both entities are owned by defendant Saul Siegman.

Plaintiffs requested Industrial Courts to contribute its proportionate common area expenses after it purchased the property. In particular, Louis Saker, a member of Building 45, would visit Industrial Courts to deliver invoices to Siegman, Janico's president. From 2015 until 2019, Siegman paid these invoices by checks written by "Janico" rather than Industrial Courts. During their course of business, Seigman represented himself to Louis Saker as "Janico." Louis Saker claimed he was led to believe Janico owned the property rather than Industrial Courts.

A-1050-24

In 2019, Siegman ceased making full payments for the common area expenses. He questioned whether it was "normal" for a building owner to pay the owner of the lot for the common expenses. Instead, Siegman made partial payments. At some point, the parties agreed that Siegman would only be responsible for expenses related to the fire suppression system.

The Litigation

On October 8, 2024, plaintiffs filed a four-count complaint in the Special Civil Part against Janico and Siegman seeking $14,238.21 under "an easement and maintenance agreement," for goods sold and delivered and/or services rendered for the reasonable value of goods and/or services sold and delivered, and based on an "agreement between the parties." Plaintiffs also sought interest and costs of suit. Attached to the complaint as Schedule A was an invoice illustrating the amounts and dates Louis Saker billed Siegman; the amounts Siegman paid; and the balance due. In total, Schedule A showed plaintiffs requested $26,681.68, and Siegman paid $12,443.47, leaving a balance of $14,238.21. Plaintiffs did not name Industrial Courts as a defendant in their complaint.

Janico and Siegman filed an answer denying the allegations and asserting separate defenses. Janico and Siegman denied there was an easement or

6

maintenance agreement between the parties. Siegman also claimed as a stockholder of Janico, he cannot be held personally responsible for any claims made by plaintiffs. The claims against Siegman individually were later dismissed.

Janico filed a second amended answer and a third-party complaint against Industrial Courts. Janico alleged Industrial Courts owns the property, and between December 31, 2019, and August 2, 2022, Industrial Courts paid third-party defendant Building 45 or Saker $12,443.47, on the basis that Building 45 was providing services to Industrial Courts. The third-party complaint alleged Building 45 represented that the charges were "fair and reasonable," but it became apparent to Industrial Courts that such representations were "false" because no services were being provided. The third-party complaint alleges Building 45 never provided any "proof" that the charges were fair and reasonable, and the monies were paid "in error" on the basis of "incorrect information."

<u>The Trial</u>

On November 7, 2024, the trial court conducted a one-day bench trial. Louis Saker testified on behalf of plaintiffs, and Siegman testified on behalf of

7

defendants. Plaintiffs moved a ledger and defendants moved a deed for the into evidence.

Louis Saker testified that plaintiffs purchased the property in the 1980's to build commercial industrial buildings to rent out or "to sell the buildings to the individual tenants, [who then became the] owners." He explained the developer's agreement was entered in 1988 with the Township. According to Louis Saker, the Township never "formally accepted" the road, which meant plaintiffs were responsible to pay for common area expenses, which

> included the maintenance of the swales on each side of the road, which ran in front of the building, the maintenance of the road . . . , the snow plowing maintenance, and the fire sprinkler maintenance, which is on a monthly basis because of the electric and all the charges from the power company, the phone company, and ADT.

Louis Saker explained he "passed off" the common area expenses to the property owners and tenants. He stated plaintiffs incurred these common area expenses and then formed a "verbal agreement" to bill the property owners and tenants for the services based on the percentage of square footage of the lots they owned or used. The terms of the agreement are reflected in notes included with the filed map, which created the property. In pertinent part, the notes state: "It shall also be common knowledge that the rail-road sidings, fire service lines, and all

8

other common utilities in this subdivision shall be maintained singularly or jointly by all of the property owners by which these utilities and/or services are used." Louis Saker testified that he did not document the billings related to expenses incurred to service the private road.

Further, Louis Saker stated the developer's agreement required plaintiffs to manage the fire suppression system, which was "the biggest expense," and they would bill the property owners and tenants for the maintenance and electric cost of the system. Plaintiffs were required to build a "fire sprinkler pump house" and use an electric pump that transmits water from "a pond on the property" into the buildings. He explained the system is "governed by an ADT alarm system," and the Township requires annual testing of the system. Louis Saker testified TPBLD 45 Pump House (TPBLD) owns the pump house for the fire sprinkler system and that he owns TPBLD.

Regarding Janico and Siegman, Louis Saker testified that he had previously "rented [Siegman] some office space in another building" prior to selling the property to Siegman. Further, when Siegman attempted to purchase the building, Louis Saker notified him the road was a private road, which plaintiffs maintain, and includes a sprinkler system.

9

Regarding his dealings with Siegman concerning the property, Louis Saker testified that Siegman paid rent exclusively through checks, which he signed under his business name, Janico, beginning in 2015. Louis Saker stated he "billed everything to Janico, and all the checks came through as Janico." He confirmed that Janico stopped paying in full around "two-and-a-half to three years" ago and started only paying "partial bills."

On cross-examination, Louis Saker testified that there was "[n]o written agreement" for the common area expenses. Louis Saker acknowledged the Township never provided a "final acceptance" under the developer's agreement, which meant plaintiffs had the continued burden to pay the common area expenses. He clarified that he was not collecting common area expenses on behalf of a formal association, such as a builder's or owner's association, but rather "took it upon [himself]" to collect the money. Louis Saker testified the bills were issued "quarterly," and the amounts billed were "substantially different" for each invoice.

At the conclusion of plaintiffs' case, defendants moved to dismiss the complaint on the grounds Janico was improperly sued and was the "wrong owner" of the property because Industrial Courts was the proper party. Defendants also argued plaintiffs failed to prove the common area expense

A-1050-24

charges were "fair and reasonable" or "divided up" properly. The trial court denied the motion to dismiss as to Janico and determined plaintiffs had established a prima facie case based on quantum meruit. However, the trial court dismissed plaintiffs' claims against Industrial Courts because it was not named as a defendant.

Siegman testified that he is the owner and president of Janico and a member of Industrial Courts. He explained Industrial Courts owns the property, and Janico rents space from it. Siegman testified he purchased the property from Louis Saker in 2015, but there was no discussion about the common area expenses. Siegman stated Louis Saker would hand deliver the invoices, and he paid them "without question" because he was "young and naïve at the time" and "not very knowledgeable" about owning property.

After speaking to another building owner, Siegman testified he began to question the common area expenses and consulted with an attorney who advised he had no obligation to pay them. As a result, Siegman stopped fully paying the invoices. Siegman questioned Louis Saker about his obligation to make these payments and "started debating some of [the] bills," leading to Louis Saker conceding Siegman only had to pay for the fire suppression system.

11

According to Siegman, there was no formal modification, but Louis Saker began accepting smaller payments after a conversation "in the hallway" that "was [not] friendly." Ultimately, Siegman testified the parties "agreed" Louis Saker would request "the water portion . . . of the bill" for the fire suppression system.

The Trial Court's Opinion

Following closing arguments, the trial court rendered an oral opinion. The trial court found the developer's agreement stipulates the burden rests with plaintiffs to pay the common area expenses, "[b]ut at some point in 2015, the parties had some level of a conversation" that amounted to "some level of a meeting of minds whereby entities represented [by Siegman] . . . agreed to pay these common area assessment charges and did so from 2015 through 2019." The trial court determined that Siegman's payments for this period provided "sufficient evidence" the parties entered "an intervening contract" that "trumped" the developer's agreement relative to the payment of common area expenses.

The trial court credited Louis Saker's testimony regarding "the pattern and practice of four years of [Saker] stopping by regularly" to collect these payments from Siegman written in the name of Janico. The trial court reasoned it was

12

"pretty clear that from 2015 to 2019, there was . . . a gentleman's agreement" where plaintiffs would bill Janico for "the fire suppression, . . . the snow plowing, . . . [and] the strip of land running in front of [Janico's] property for landscaping."

The trial court also found Siegman's testimony credible he had a conversation with someone in 2019 who informed him that he was not required to make these payments to Saker. The trial court noted Siegman, however, continued to make partial payments after this conversation for about three years from December 31, 2019, to October 2022, and then stopped making payments altogether. The trial court reasoned that Siegman's continued payments after the conversation where he was informed that he was not required to pay is "further evidence" of a contract and amounted to "doubling down" on the "gentlemen's agreement." The trial court recognized that Janico was not the property owner, but it found "there[ is] some level of overlapping" between Siegman and Janico.

The trial court determined the parties entered into an oral contract, and Janico breached that contract and caused $14,238.21 in damages, the amount sought by plaintiffs. The trial court found an agreement was reached that Siegman only had "to pay for the [fire] suppression system," based on a conversation "in a hallway" resulting in an "oral modification" of the contract.

A-1050-24

Going forward, the trial court ruled Janico would only have to pay for the fire suppression system.

The trial court also held that quantum meruit applied. The trial court reasoned that even though it found there was "an express or contract implied in fact based on the oral agreement and/or the pattern in practice," a "quasi-contract may be imposed" to bring about "justice without reference to the intention of the parties." The trial court reasoned:

> Quasi-contractual liability rests on [the] equitable principle that a person should not be allowed to enrich himself unjustly at the expense of another. So, here to recover, plaintiff[s] conferred a benefit on [Janico]. Plaintiff[s] conferred said benefit with a reasonable expectation that [Janico] would pay for it, . . . under circumstances that should have put defendant on notice that plaintiff[s] expected to be paid.
>
> We have all that here. There is a benefit to [defendants] of having a fire suppression system. There[ is] a benefit to [Janico] and there was testimony that[ is] where the landscaping[ is] done and the grass is cut. It[ is] right out front of [its] property.
>
> There[ is] a benefit to the roads being plowed, and given all the facts, . . . quantum meruit would also allow for the recovery.

Lastly, the trial court addressed defendants' argument that "even if there is a contract, the metes and bounds are[ not] clear enough." The trial court disagreed and found "[i]t was clear enough [Louis Saker] knew that [defendants]

14

would be writing a check on some level of a regular basis when [Louis Saker] came over with the invoices."

The trial court noted "the metes and bounds" description of the property included the fire suppression system with ADT, the heat, snow plowing, and landscaping.  The trial court concluded the sum of the fees is "divided up among the five properties [on] . . . a proportional basis based on square footage, and the pattern of practice where this got paid for four years without any objection really defines what the metes and bounds are."  A memorializing order was entered. This appeal followed.

Before us, Janico argues the trial court erred:

> (1) in failing to apply the test for piercing the corporate veil in finding Janico liable for expenses that would be the responsibility of Industrial Courts;
>
> (2) in finding there was an enforceable contract between Janico and plaintiffs; and
>
> (3) in finding quantum meruit applies.

II.

Appellate courts apply a deferential standard in reviewing factual findings by a judge.  Balducci v. Cige, 240 N.J. 574, 595 (2020).  In an appeal from a bench trial, appellate courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions."

Griepenburg v. Township of Ocean, 220 N.J. 239, 254 (2015).  Deference is given to credibility findings.  State v. Hubbard, 222 N.J. 249, 264 (2015).  "Appellate courts owe deference to the trial court's credibility determinations as well because it has 'a better perspective than a reviewing court in evaluating the veracity of a witness.'"  C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).

"A reviewing court must accept the factual findings of a trial court that are 'supported by sufficient credible evidence in the record.'"  State v. Mohammed, 226 N.J. 71, 88 (2016) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)).  "Reviewing appellate courts should 'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'"  Griepenburg, 220 N.J. at 254 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

The deferential standard is applied "because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci, 240 N.J. at 595.  However, this court reviews de novo the trial court's interpretations of law, including the

16

interpretation of a contract.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); see also Serico v. Rothberg, 234 N.J. 168, 178 (2018).

### III.

Janico first argues the trial court erred in finding it liable because the court failed to apply the proper test for piercing the corporate veil.  According to Janico, if the trial court had performed the test properly, Industrial Courts would be liable, not Janico.  In Janico's view, the trial court simply relied on the fact that there was an "overlap" in ownership between the corporate entities.  Janico maintains that Industrial Courts is its sister corporation, and there is no parent and subsidiary relationship.  Janico contends there is no evidence to support piercing the corporate veil against the entities.

Plaintiffs counter Siegman never represented he was affiliated with any other entity besides Janico and never observed corporate formalities.  Plaintiffs argue the evidence demonstrated that the only entity involved in these dealings was Janico.

"[A] corporation is an entity separate from its shareholders.  In the absence of fraud or injustice, courts generally will not pierce the corporate veil to impose liability on the corporate principals."  Lyon v. Barrett, 89 N.J. 294, 300 (1982).

17

"Although a corporation and its stockholders are usually treated as separate entities, 'a court of equity is always concerned with substance and not merely form, and thus, it will go behind the corporate form where necessary to do justice.'" Hartford Fire Ins. Co. v. Conestoga Title Ins. Co., 328 N.J. Super. 456, 459 (App. Div. 2000) (quoting Walensky v. Jonathan Royce Int'l, Inc., 264 N.J. Super. 276, 283 (App. Div. 1993)).  The party seeking to pierce the corporate veil bears the burden of proof.  Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc., 195 N.J. 457, 472 (2008).  Generally, veil-piercing is appropriate only where the corporation's principals misused the corporate entity "to perpetrate fraud, to accomplish a crime, or otherwise to evade the law."  Dep't. of Env't Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983).

We reject Janico's argument that the trial court pierced the corporate veil. It is immaterial that plaintiffs did not amend their complaint to allege claims against Industrial Courts.  Janico concedes that both Janico and Industrial Courts are owned by the same individual—Siegman.  Moreover, the trial court determined there was a "meeting of the minds" whereby "entities represented by . . . Siegman, and whether it[ is Industrial Courts] or Janico, agreed to pay these common area assessment charges."  The record supports that determination.

A-1050-24

Accordingly, we reject Janico's argument that the trial court pierced the corporate veil.

IV.

Next, Janico contends the trial court erred in finding an enforceable contract and improperly relied on the "course of conduct" between the parties. Janico argues there was no consideration to justify an enforceable contract. Under the "pre-existing duty rule," Janico maintains plaintiffs were obligated to pay for common area expenses under the developer's agreement. Janico avers a course of conduct can only be used to interpret contracts and is insufficient to create a new contract. We need not address whether a contract was formed because the record amply supports the trial court's finding of liability based on quantum meruit.

V.

Finally, we reject Janico's argument that the trial court erred in finding quantum meruit applies.

> Quantum meruit is a form of quasi-contractual recovery and "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992) (quoting Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 108 (App. Div. 1966)). "Courts generally allow recovery in quasi-contract when one party has conferred a benefit on

another, and the circumstances are such that to deny recovery would be unjust." Ibid.

> [Starkey, Kelly, Blaney & White v. Estate of Nicolaysen, 172 N.J. 60, 68 (2002).]

To recover on a quantum meruit claim, a plaintiff must establish four elements: "(1) the performance of services in good faith, (2) the acceptance of services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Ibid.

"[A] quasi-contractual obligation is wholly unlike an express or implied-in-fact contract in that it is 'implied by the law for the purpose of bringing about justice without reference to the intention of the parties.'" Saint Barnabas Medical Ctr. v. County of Essex, 111 N.J. 67, 79 (1988). "[T]he existence of an express contract excludes awarding relief regarding the same subject matter based on quantum meruit." Kas Oriental Rugs, Inc. v. Ellman, 394 N.J. Super. 278, 286 (App. Div. 2007).

On appeal, Janico acknowledges that there was "some level of benefit" conferred upon it by plaintiffs under the first quantum meruit prong. However, Janico challenges the trial court's finding that prong two was satisfied because there was no reasonable expectation Janico would pay for the common area

expenses. Janico also takes issue with the trial court's finding under prong three because Janico claims it was never on notice that plaintiffs expected to be paid.

Under prong one, the facts found by the trial court establish plaintiffs conferred a benefit on Janico by supplying services it required to operate its business. Turning to prong two, plaintiffs had a reasonable expectation that Janico would pay the common area expenses based on the unrefuted evidence Siegman paid all bills for the first several years Janico occupied the property based on the parties' testimony and checks tendered by Siegman to Louis Saker. Regarding prong three, based on the benefits conferred on Janico, and the fact bills were delivered to and paid by Siegman, Janico was on notice that plaintiffs expected to be paid. As to prong four, the record illustrates plaintiffs charged Janico a reasonable amount for the services. Therefore, based on our review, we conclude the trial court did not err in finding quantum meruit applies.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1050-24